# In the United States Court of Federal Claims

No. 06-942 L

(Filed June 19, 2008)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | Tribal Trust Claims; 28 U.S.C. |
| PASSAMAQUODDY TRIBE, | * | § 1500 (2000); RCFC 12(b)(1); |
| | * | Whether Same-Day Filings are |
| *Plaintiff*, | * | *Per Se* Pending for the Purposes |
| | * | of Section 1500; More Weight |
| v. | * | Given to Contemporaneous |
| | * | Documentary Evidence than to |
| THE UNITED STATES, | * | Inconsistent Testimony Provided |
| | * | During Litigation; Substantially |
| *Defendant*. | * | the Same Operative Facts; |
| | * | Overlapping Requested Relief |
| | * | that is Not Distinctly Different. |
| | * | |
| * * * * * * * * * * * * * * | * | |

*Keith Harper*, with whom were *G. William Austin* and *Catherine F. Munson*, Washington, D.C., for plaintiff.

*Laura M.L. Maroldy*, United States Department of Justice, with whom was *Ronald J. Tenpas*, Assistant Attorney General, Washington, D.C., for defendant. *Thomas Kearns* and *Elisabeth Brandon*, Office of the Solicitor, United States Department of the Interior, *Teresa E. Dawson*, Office of the Chief Counsel, Financial Management Service, United States Department of the Treasury, and *Kevin Regan*, United States Department of Justice, Washington, D.C., of counsel.

---

## OPINION

---

**Bush**, *Judge*.

The court has before it Defendant's Motion to Dismiss Pursuant to 28 U.S.C. § 1500, for which an evidentiary hearing was held February 1, 2008. Briefing on defendant's motion was re-opened for simultaneous post-hearing sur-reply briefs, filed on March 20, 1998. For the reasons stated below, defendant's motion to dismiss for lack of jurisdiction is granted and plaintiff's complaint in this court must be dismissed, without prejudice.

**BACKGROUND**

On December 29, 2006, the last day the Clerk's Office of the United States Court of Federal Claims (COFC or CFC) was open for business in 2006, plaintiff filed a complaint (Compl. or *Passamaquoddy COFC*) before this court requesting damages for breaches of trust by the United States. The same day, plaintiff filed a complaint (DDC Compl. or *Passamaquoddy DDC*) in the United States District Court for the District of Columbia (DDC) also requesting relief related to breaches of trust responsibilities by the United States. *See Passamaquoddy Tribe of Maine v. Kempthorne*, No. 1:06-cv-02240-JR. The court must determine whether 28 U.S.C. § 1500 (2000), in the circumstances of these filings, removes jurisdiction over plaintiff's claims in the subject matter. The relevant text of the statute is reproduced here:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States . . . .

*Id.* Putting aside, for the moment, the question of whether the claim in another court must be the same or, alternatively, merely have some overlap with the one filed in this court, as a general proposition the jurisdictional bar in § 1500 is triggered when there is a pending claim in a district court at the time the "same" claim is filed in this court.

Plaintiff's counsel has now faced § 1500 challenges to three other tribal trust cases he filed in this court on December 29, 2006, for different tribal plaintiffs. The underlying facts of these multiple filings, and the decisions made on the § 1500 issue in these cases, are necessary to the court's analysis in the subject matter. The court briefly discusses the facts of each of the cases filed here by plaintiff's

counsel on December 29, 2006, and the disposition of the § 1500 jurisdictional challenges decided thus far. The court undertakes a more thorough examination of the evidentiary disputes related to these cases *infra*.

*Tohono O'odham Nation v. United States*, No. 06-944 L

Unlike the other cases filed here by plaintiff's counsel on December 29, 2006, *Tohono O'odham Nation v. United States*, No. 06-944 L (*Tohono O'odham COFC*), posed no dispute, factual or legal, as to whether a case was pending in the United States District Court for the District of Columbia at the time the *Tohono O'odham* case was filed here. On December 28, 2006, plaintiff's counsel filed *Tohono O'odham Nation v. Kempthorne*, No. 1:06-cv-02236-JR (*Tohono O'odham DDC*), in the district court. The next day, December 29, 2006, *Tohono O'odham COFC* was filed here. Thus the suit in the district court was pending, for one day, when *Tohono O'odham COFC* was filed in this court, and the only issue before the court was whether the overlap in claims was sufficient to defeat jurisdiction here. *See Tohono O'odham Nation v. United States*, 79 Fed. Cl. 645, 654 (2007) (*Tohono O'odham I*) ("The feature of section 1500 that is controverted here is the question of whether the complaints involve the same "'claim.'"), *appeal docketed*, No. 08-5043 (Fed. Cir. Feb. 20, 2008).

After a detailed comparison of the operative facts alleged in each suit and the types of relief requested from the district court and this court, the *Tohono O'odham I* court concluded that indeed the claims overlapped sufficiently to trigger the jurisdictional bar of § 1500. *See id.* at 659 ("There is plainly substantial overlap in the operative facts as well as in the relief requested. That being the case, unfortunately for plaintiff, section 1500 is a bar."). *Tohono O'odham COFC* was dismissed for lack of jurisdiction. The court commented: "We recognize that, if the filing dates of the complaints had been reversed, section 1500 would not be a problem and the two courts would use traditional principles of comity, collateral estoppel, and res judicata to sort out any duplication." *Tohono O'odham I*, 79 Fed. Cl. at 659 n.16.

*Ak-Chin Indian Community v. United States*, No. 06-932 L

For this tribal plaintiff, counsel filed two complaints on December 29, 2006. One, *Ak-Chin Indian Community v. United States*, No. 06-932 L (*Ak-Chin COFC*),

was filed in this court. The other, *Ak-Chin Indian Community v. Kempthorne*, No. 1:06-cv-02245-JR (*Ak-Chin DDC*), was filed in the United States District Court for the District of Columbia. The parties hotly disputed whether the district court filing was pending when the *Ak-Chin COFC* complaint was filed in this court. The parties also differed as to whether the operative facts and relief requested overlapped enough to potentially trigger the § 1500 jurisdictional bar. A brief review of both of these disputes is instructive.

As to whether *Ak-Chin DDC* was pending when *Ak-Chin COFC* was filed, this type of dispute poses two questions, one legal, and one evidentiary. First, does the term "has pending," as used in § 1500, require a court to examine the order of filing for same-day filings, or, do two same-day filings in and of themselves, regardless of the order of filings on that day, satisfy the statutory element of having a suit pending in another court, which would then deprive this court of jurisdiction over its case if the other elements of § 1500 are met? The court in *Ak-Chin* disposed of this question rather succinctly:

> Defendant argues, without precedential authority, that "an action in another court should be deemed 'pending' if it was filed on the same day as a complaint in this court." The court respectfully disagrees and will not further address the issue in this Opinion.

*Ak-Chin Indian Cmty. v. United States*, 80 Fed. Cl. 305, 308 n.4 (2008) (*Ak-Chin I*) (citation to defendant's brief omitted). The court will return to this legal question, *infra*.

Assuming, *arguendo*, that the order of filing of two same-day filings must be established to determine whether the "has pending" element of § 1500 is satisfied, some level of evidentiary inquiry is required if the parties cannot agree as to the sequence of the same-day filings. This, indeed, is the evidentiary issue that confronted the *Ak-Chin I* court, and the final resolution of this issue required discovery, briefing, an evidentiary hearing, oral argument, and post-hearing briefing.[1] Of particular interest is testimony taken from a paralegal who performed

---

[1]/ Neither this court, nor the United States District Court for the District of Columbia, (continued...)

the filings in question, Ms. Alexis Applegate. The transcript from the hearing containing Ms. Applegate's testimony regarding the order of filings of *Ak-Chin COFC* and *Ak-Chin DDC* on December 29, 2006, Transcript of *Ak-Chin COFC* Hearing held October 24, 2007 (*Ak-Chin* Tr.), is of interest and relevant here.[2] Her testimony, over the course of three evidentiary hearings in three different cases before this court, reports on her actions in filing all of her firm's tribal trust claims that day in both courts.

In *Ak-Chin I*, the court found Ms. Applegate to be "a credible witness," and that her time-line for the filings of *Ak-Chin COFC* and *Ak-Chin DDC* on December 29, 2006 was "not implausible or inconsistent with the record." 80 Fed. Cl. at 313. Because Ms. Applegate testified that she filed *Ak-Chin COFC* before *Ak-Chin DDC*, the court concluded that, "based on its view of the preponderance of the credible evidence before it," *Ak-Chin DDC* was not pending when *Ak-Chin COFC* was filed. *Id.* The court then turned to the issue of whether, had *Ak-Chin DDC* been pending when *Ak-Chin COFC* was filed, the two complaints contained some overlap in the operative facts and relief requested, enough to have triggered the § 1500 jurisdictional bar.[3]

Just as in *Tohono O'odham I*, the *Ak-Chin I* court engaged in a lengthy comparison of the complaints filed in the district court and this court. The court identified similarities between these documents, noting that the claims "involve the same parties, the same trust corpus, and the same allegations that the government breached its trust responsibilities." *Ak-Chin I*, 80 Fed. Cl. at 317. The court concluded that the two complaints were "based on the same operative facts." *Id.*

As to the relief requested in each court, the court held that "the results sought in each action include overlapping relief." *Id.* at 321. The court approved of the reasoning in *Tohono O'odham I* which identified a request, in similar

---

[1](...continued)
time-stamps complaints received for filing.

[2]/ Neither party objected to making the transcripts of evidentiary hearings in similar cases part of the record in the subject matter.

[3]/ The court addressed this issue for two reasons: (1) to respond fully to the questions before it; and (2) to ensure that any later review of its disposition of the § 1500 issue could proceed efficiently. *See Ak-Chin I*, 80 Fed. Cl. at 308 & n.3, 313.

complaints filed by the same counsel in both the district court and this court, for monetary relief related to the government's breach of trust duties.[4] *Id.* The *Ak-Chin I* court concluded that "[b]ecause plaintiff's complaints are based on the same operative facts and seek overlapping relief that is not distinctly different, . . . § 1500 would preclude jurisdiction if plaintiff's Court of Federal Claims complaint had not been found to have been filed before plaintiff's District Court complaint." *Id.* at 322 (citations omitted).

*Salt River Pima-Maricopa Indian Community v. United States*, No. 06-943 L

Again, plaintiff's counsel filed two suits on December 29, 2006. One, *Salt River Pima-Maricopa Indian Community v. United States*, No. 06-943 L (*Salt River COFC*), was filed in this court. The other, *Salt River Pima-Maricopa Indian Community v. Kempthorne*, No. 1:06-cv-02241-JR (*Salt River DDC*), was filed in the United States District Court for the District of Columbia. Once again, the parties hotly disputed whether the district court complaint was pending when *Salt River COFC* was filed in this court. The parties also disputed whether the claims in the two courts overlapped so as to trigger the § 1500 bar, but the court did not reach this issue.

To resolve the § 1500 question in *Salt River COFC*, the court ordered discovery, briefing, a formal evidentiary hearing for receiving the testimony of plaintiff's paralegal, Ms. Applegate,[5] an informal hearing regarding filing procedures in this court,[6] and post-hearing briefing. These procedures were undertaken to fully examine what happened on December 29, 2006, and to establish the order in which the filings of *Salt River COFC* and *Salt River DDC* occurred. Testimony was taken on events which had transpired almost one year

---

[4]/ Plaintiff in *Ak-Chin COFC* conceded that there were no "substantive distinctions" between the two complaints filed in *Tohono O'odham COFC* and *Tohono O'odham DDC* and the two complaints filed in *Ak-Chin COFC* and *Ak-Chin DDC*, except that the *Tohono O'odham* complaints were filed one day apart. *See Ak-Chin Indian Cmty. v. United States*, No. 06-932 L, Plaintiff's Brief in Response to the Court's Request for Briefing Regarding the Opinion Issued in *Tohono O'odham v. United States*, at 2 (Fed. Cl. Jan. 7, 2008).

[5]/ Transcript of *Salt River COFC* Hearing held December 10, 2007 (*Salt River* Tr.).

[6]/ Transcript of *Salt River COFC* Informal Hearing held December 12, 2007 (*Salt River* Add'l Tr.).

beforehand.

The court rejected defendant's argument that a same-day filing in a district court is *per se* "pending" for the purposes of § 1500, noting that this court had previously rejected that argument. *Salt River Pima-Maricopa Indian Cmty. v. United States*, No. 06-943 L, 2008 WL 1883170, at *5 (Fed. Cl. Apr. 24, 2008) (*Salt River I*) (citing *Breneman v. United States*, 57 Fed. Cl. 571, 574, 576-77 (2003), *aff'd on other grounds*, 97 Fed. Appx. 329 (Fed. Cir. 2004)).[7] The *Salt River I* court also relied on *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed. Cir. 1994) (*en banc*); *Tecon Engineers, Inc. v. United States*, 343 F.2d 943, 946 (Ct. Cl. 1965); and *Ak-Chin I*, 80 Fed. Cl. at 308 n.4, for its determination that the order of same-day filings, even where neither court time-stamps its filings, is an evidentiary issue that must be resolved in order to decide a motion to dismiss based upon § 1500. *Salt River I,* 2008 WL 1883170, at *4-*5. The court then turned to the evidentiary issue before it.

The *Salt River I* court thoroughly discussed the types of documentary evidence before it, and the informal and formal testimony it had received in hearings. In the end, two aspects of that evidence appeared to be pivotal. First, Ms. Applegate was found to be a credible witness. *Salt River I*, 2008 WL 1883170, at *15. Second, the court decided that the numbering of receipts for the complaints filed in this court, and an inconsistency in Ms. Applegate's testimony regarding the time she received those receipts, were not particularly significant facts in determining the order in which complaints were filed on December 29, 2006. *Id.* at *14. The *Salt River I* court found that "[p]laintiff has proved by a preponderance of the evidence that the CFC complaint was the first of the *Salt River* Complaints filed on December 29, 2006." *Id.* at *15.

## DISCUSSION

### I. Standard of Review for a Motion to Dismiss for Lack of Jurisdiction

Plaintiff bears the burden of establishing subject matter jurisdiction, *Alder*

---

[7]/ Plaintiff in the subject matter filed a Motion for Leave to File Notice of Supplemental Authority on April 29, 2008, concerning the fact that *Salt River I* had issued. Plaintiff's motion received no response from defendant. Because the *Salt River I* opinion, although unpublished, is readily available to the court, plaintiff's motion is denied as moot.

*Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted). If jurisdiction is found to be lacking, this court must dismiss the action. Rule 12(h)(3) of the Rules of the United States Court of Federal Claims (RCFC). In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds*, 846 F.2d at 747. If jurisdictional facts are challenged, however, the court must weigh the evidence presented and must make findings of fact pertinent to its jurisdiction. *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) (noting that when "facts underlying the controverted jurisdictional allegations are in dispute [these] are subject to fact-finding by the [trial] court") (citations omitted)).

## II. Analysis of the "Pending" Issue

### A. Whether Same-Day Filings are *Per Se* Pending for the Purposes of § 1500

Defendant urges the court to approve its position, rejected in *Breneman*, *Ak-Chin I* and *Salt River I*, that a same-day filing of the same claim in a district court, regardless of the order of filing on that day, deprives this court of jurisdiction because of the bar raised by 28 U.S.C. § 1500. Although none of the cases ruling against defendant's position are binding precedent, the court is always hesitant to disagree with a reading of the law by other judges on this court. Reasonable minds may disagree on this and other points of law, however, and a trial court must discharge its duty of discerning legal authority and applying that authority to the controversy before it.

The United States Court of Appeals for the Federal Circuit has ruled that this court must not engage in a *de novo* interpretation of statutes such as § 1500; rather, it should carefully follow the binding precedent in this circuit as to the meaning of the relevant statutory terms:

> We reject the court's initial de novo interpretation of [the statute in question] because the Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court. Trial courts are not free to make the law anew simply because they disagree with the precedential and authoritative analysis of a reviewing appellate court.

*Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005). Keeping this instruction firmly in mind, the court reviews authority it considers pertinent to the issue at hand. Section 1500 has a long history, and a complex one.

**1. The Jurisdictional Bar Now Codified at 28 U.S.C. § 1500**

In 1868, Congress first raised a jurisdictional bar to suits in this court in circumstances where a claimant has the same claim pending in a district court. Act of June 25, 1868, ch. 71, § 8, 15 Stat. 75, 77. The legislative history of this statute is perfectly silent as to the issue of same-day filings and the meaning of the words "has pending." *See* 81 Cong. Globe, 40th Cong., 2nd Sess. 2769 (1868). The sponsor's explanation of the purpose of the jurisdictional bar is reproduced here in its entirety:

> The object of this amendment is to put to their election that large class of persons having cotton claims particularly, who have sued the Secretary of the Treasury and the other agents of the Government in more than a hundred suits that are now pending, scattered over the country here and there, and who are here at the same time endeavoring to prosecute their claims, and have filed them in the Court of Claims, so that after they put the Government to the expense of beating them once in a court of law they can turn around and try the whole question in the Court of Claims. The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts. I am sure

everybody will agree to that.

*Id.* Despite certain modifications in language and re-codifications not relevant here, the jurisdictional bar has remained mostly unchanged since 1868 and the words "has pending" have remained in all versions of the statute. *See Keene Corp. v. United States*, 508 U.S. 200, 210 (1993) (*Keene*) (noting that certain phrases in the statute have remain unchanged); *UNR Indus. v. United States*, 962 F.2d 1013, 1017-19 (Fed. Cir. 1992) (*en banc*) (describing the statutory history of § 1500 as "fairly straightforward" and noting that few changes in language have occurred therein), *aff'd sub nom. Keene Corp. v. United States*, 508 U.S. 200 (1993).

The jurisdictional bar in § 1500 has been much criticized for being an awkward tool that has outlived its original purpose. *See generally, e.g.*, Paul F. Kirgis, *Section 1500 and the Pitfalls of Federal Government Litigation,* 47 Am. U. L. Rev. 301 (1997); Payson R. Peabody, Thomas K. Gump & Michael S. Weinstein, *A Confederate Ghost That Haunts the Federal Courts: The Case for the Repeal of 28 U.S.C. § 1500*, 4 Fed. Cir. B.J. 95 (1994); David Schwartz, *Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents*, 55 Geo. L.J. 573 (1967). Courts have commented that the application of the statute may lead to nonsensical or anachronistic results. *See Tohono O'odham I*, 79 Fed. Cl. at 659 n.16 ("While this illustrates the lack of need for section 1500 and its arbitrariness, we can do no more than make this observation and suggest that plaintiff attempt a legislative solution through a congressional reference or a new jurisdictional statute."); *A.C. Seeman, Inc. v. United States*, 5 Cl. Ct. 386, 389 (1984) ("Section 1500 is an anachronism. It was first enacted in 1868, and over the years has been encrusted with numerous shadings and tortured constructions. It is part of the Code, however, and its restrictions on jurisdiction cannot be ignored."); *see also d'Abrera v. United States*, 78 Fed. Cl. 51, 56 n.10 (2007) (describing § 1500 as offering "a significant trap for the unwary . . . [which] could entirely bar a cause of action from being heard"). Despite these criticisms, this court has no choice but to attempt to apply § 1500 in a way consistent with its purpose, a purpose which is defined less by its legislative history than by subsequent precedential interpretation. As the court turns to a review of relevant caselaw, two themes emerge: the general purpose of § 1500, and the identification of specific, carved-out exceptions, related to the timing of the filings in question, which prevent the application of § 1500's jurisdictional bar. It is also useful to distinguish between a separate suit filed before the date of the filing in this court,

after the date of the filing in this court, and on the date of the filing in this court, in elucidating the meaning of the statutory term "has pending."[8]

### 2. Court of Claims Precedent Regarding Same-Day and Later-Filed Suits in Other Courts

There appears to be no controversy that suits filed in a district court prior to the date of a filing in this court are included and have always been included within the concept of "has pending" and serve to trigger the jurisdictional bar now codified in § 1500. *See Frantz Equip. Co. v. United States*, 98 F. Supp. 579, 580 (Ct. Cl. 1951) ("The plaintiff, on March 8, 1946, prior to the filing of its petition herein on September 11, 1950, made use of a counterclaim to assert its claim against the United States, in connection with the suit instituted against the plaintiff by the United States, and asked judgment thereon against the United States in the sum of $12,727.21. By so doing the plaintiff lost its right, so long as said claim remained pending in the District Court, to institute and maintain suit in this court upon the same claim."). When it comes to later-filed suits, there has been a convoluted history of evolving precedent. In various decisions, the Court of Claims applied § 1500 to deny jurisdiction in this court where there had been later-filed actions in another federal court. For example, in *Maguire Industries v. United States*, 86 F. Supp. 905 (Ct. Cl. 1949), the court dismissed a suit in this court because of a later-filed appeal to the United States Court of Appeals for the District of Columbia, which challenged the dismissal of a claim which had first been brought in the Tax Court. *Id.* at 906 ("[O]n March 28, 1949, plaintiff filed its petition in this court. Subsequent thereto, however, plaintiff perfected an appeal to the United States Court of Appeals for the District of Columbia from the determination of the Tax Court . . . ."). In *Maguire*, even though litigation was begun in the Tax Court before a suit was filed in this court, it was the later-filed appeal in the Court of Appeals which triggered § 1500's jurisdictional bar. *See id.* at 907 (noting that "the proceedings in the Court of Appeals for the District of Columbia was a suit" requiring application of the § 1500 bar).

Similarly, in *Hobbs v. United States*, 168 Ct. Cl. 646 (1964), a suit was

---

[8]/ The term "this court," as it is used here, refers to this trial court and its predecessors, including the Court of Claims, the United States Claims Court, and the United States Court of Federal Claims.

dismissed in this court because of a later-filed appeal in the United States Court of Appeals for the Fifth Circuit. The plaintiff had first sought compensation from the Atomic Energy Commission (AEC) for alleged use of his patents. *Id.* at 647. A few months after that claim was denied, Mr. Hobbs filed a suit in this court encompassing the same claim, on August 29, 1963. *Id.* The next day, on August 30, 1963, Mr. Hobbs filed a petition for review of the AEC decision in the Fifth Circuit. *Id.* The Court of Claims dismissed the suit before it, applying the jurisdictional bar in § 1500 even though the suit in the Fifth Circuit was filed one day after suit was filed in this court. *Id.* at 647-48.

From these cases, it is clear that for some years, the statutory term "has pending" in § 1500 was read broadly enough to include later-filed suits in another court, not just those filed before the day suit was filed in this court. Not surprisingly, in that era, same-day filings in another court were also considered to be within the scope of the "has pending" language in § 1500. For example, in *British American Tobacco Co. v. United States*, 89 Ct. Cl. 438 (1939) (*British American*), the plaintiff filed two suits on the same day, one in the United States District Court for the Southern District of New York, and the other in the Court of Claims. *Id.* at 439. Both suits sought compensation for gold bullion delivered to the Federal Reserve Bank of New York. *Id.* The district court and the regional appellate circuit found against the plaintiff. *Id.* at 441. The Court of Claims suit was dismissed, pursuant to § 1500. Thus, a same-day filing in a district court deprived this court of jurisdiction, with no discussion of the order of filing on the day both suits were filed. The "has pending" language of § 1500 encompassed a case where a same-day filing had occurred.[9]

Similarly, in *National Cored Forgings Co. v. United States*, 132 F. Supp.

---

[9]/ There was a slight change in the wording of the jurisdictional bar in 1948, but this change does not appear to have modified how courts have interpreted the term "has pending" as it might apply to same-day filings. *See Keene*, 508 U.S. at 209-10 (commenting, in regard to the 1948 modifications in language, that "we do not presume that the revision worked a change in the underlying substantive law"). Thus, the court considers the holding of *British American* to apply with full force to the issue of same-day filings under the current version of the statute. *See Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1562 (Fed. Cir. 1988) ("[S]ince all changes after the original version [of what is now § 1500] were intended as but changes in phraseology, we must presume Congress was aware of and adopted the judicial interpretations of section 1500 and its predecessors.") (citations omitted).

454 (Ct. Cl. 1955) (*National Cored Forgings*), the plaintiff filed two suits on November 20, 1951, one in the Court of Claims and the other in the United States District Court for the District of Columbia. *Id.* at 457. The same contract claims were brought in each suit. *Id.* The district court suit was stayed to allow the Court of Claims suit to proceed, *id.*, but the Court of Claims dismissed the suit before it pursuant to § 1500, *id.* at 459. Again, the "has pending" language of § 1500 encompassed a case where a same-day filing had occurred, although this aspect of the case received no commentary from the court. Thus, the Court of Claims held, during this period, that earlier-filed suits, later-filed suits, and same-day filed suits in another federal court deprived this court of jurisdiction pursuant to the "has pending" language of § 1500, when the same claim was pending in each suit. Precedent on this issue shifted in 1965, and the pertinent question here is to what extent.

### 3. The *Tecon* Rule

In *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), the Court of Claims revisited the issue of whether later-filed suits in another federal court could deprive this court of jurisdiction pursuant to the "has pending" language of § 1500. In an unusual procedural posture, the plaintiffs brought consolidated cases before the Court of Claims, prosecuted them for over two years, were frustrated in their request to postpone trial, and, immediately upon rejection of their appeal of the denial of that requested continuance, filed identical claims in the United States District Court for the Eastern District of Kentucky on January 26, 1965. *Id.* at 944 & n.1. On the same day, the plaintiffs moved to have their Court of Claims suit dismissed for lack of jurisdiction pursuant to § 1500. *Id.* at 944. The plaintiffs also indicated that if they did not prevail and win dismissal pursuant to § 1500, that they would "refus[e] to further prosecute these actions [in the Court of Claims]." *Id.* Although the analysis of the § 1500 issue presented in the *Tecon* decision is too lengthy to reproduce in all of its detail, the court here excerpts certain relevant highlights.

First, the question before the court was fairly narrow:

> The question presented is whether plaintiffs by this motion may oust this court of its conceded jurisdiction under the Tucker Act over these pending suits by later

> filing new suits for the same claims in a Federal district court, and then moving to dismiss these same cases here, for lack of jurisdiction.

*Id.* at 944-45. Second, § 1500 was understood to have descended from the 1868 legislation and to not have deviated from the original purpose of that earlier jurisdictional bar:

> The statute of 1868 was enacted to eliminate duplication of litigation between claimants and the Government or its agents, and to prevent conflicts of jurisdiction between the Court of Claims and other courts. Section 1500 was enacted with the same basic legislative purpose.

*Id.* at 948. The Act of June 25, 1868, according to the *Tecon* court, had this purpose: "Congress clearly intended that if a claimant "shall have commenced and has pending" a suit in another court against any officer of the United States, the Court of Claims was to be divested of jurisdiction over the same claim when brought against the United States if the claim was filed thereafter in this court." *Id.* at 947-48.

From this analysis derived what could be called the *Tecon* rule, quoted here in its most succinct form:

> [W]e conclude that the only reasonable interpretation of the statute is that it serves to deprive this court of jurisdiction of any claim for or in respect to which plaintiff has pending in any other court any suit against the United States, only when the suit shall have been commenced in the other court before the claim was filed in this court.

*Id.* at 949. Certain language from the opinion raises the question whether the *Tecon* rule might have been limited to the specific facts of that case. *See id.* at 950 (noting that "[t]he cases cited by plaintiffs (and other relevant cases) are not particularly germane to our resolution of the correct interpretation of Section 1500, with respect to the facts of this case"). The Federal Circuit, however, has ruled that

*Tecon* is not limited to its facts. *Hardwick Bros. II v. United States*, 72 F.3d 883, 886 (Fed. Cir. 1995) (*Hardwick*). Even though the *Tecon* rule is of general applicability, there are several reasons to believe that the *Tecon* rule was not meant to, and does not today, apply to two suits filed on the same day. *See United States v. County of Cook, Ill.*, 170 F.3d 1084, 1090 (Fed. Cir. 1999) (*County of Cook*) (noting that the statement in *Tecon* which embodies the *Tecon* rule, excluding later-filed district court claims from the scope of the jurisdictional bar in § 1500, was "dictum with respect to the simultaneous filing issue"). Indeed, prior caselaw in the Court of Claims involving same-day filings is specifically cited in *Tecon* as being distinguishable from the issue then before the *Tecon* court, *i.e.*, the issue of whether a district court filing occurring after a filing in this court would trigger § 1500. *See* 343 F.2d at 950 n.4.

First, the *Tecon* court noted the intent of Congress to prevent duplicative suits from being filed in a district court and this court. *Id.* at 948. It is hard to imagine a scenario more indicative of duplicative filings than that of filing two suits, embracing the same claims, in two courts on the same day, regardless of the order of filing. That scenario is very different from the one presented in *Tecon*, where two years elapsed before the plaintiffs attempted to defeat jurisdiction in this court by filing the same claims in a district court. Second, the *Tecon* court distinguished its case from instances where "simultaneous" filings occurred. *Id.* at 950 n.4. The simultaneous filing category is described only by citing the decisions in *British American* and *National Cored Forgings*, which are, of course, cases involving same-day filings, with no mention of the order of filing as a relevant issue, and *Hobbs*, a case where the district court case was filed one day *after* the Court of Claims suit. *Id.* Because *Hobbs*, too, was described as a simultaneous filing case by the *Tecon* court and considered distinguishable from the *Tecon* fact scenario, it is difficult to believe that a same-day filing in a district court, even if the plaintiff could prove that the case was filed some minutes or hours later than the case filed in this court, would somehow be envisioned by the *Tecon* court to benefit from the *Tecon* rule. For these reasons, the court cannot read the *Tecon* rule as including same-day filings cases in the category of later-filed district court cases which, after *Tecon*, do not trigger the jurisdictional bar of § 1500.[10]

---

[10]/ There is language in *Tecon* which states that the court did not feel bound by decisions which did not discuss the significance of the order of filings in dismissing a case pursuant to § 1500. 343 F.2d at 950 (stating that because "the issue of priority was [n]ever fully briefed, (continued...)

Nothing in the cases decided in the next thirty years contradicts this interpretation of the *Tecon* rule. Indeed, the court has found no binding precedent on the same-day filing issue, as of this date, which undermines its interpretation of *Tecon*. Same-day filings of the same claim in a district court and this court, until recently, routinely triggered dismissal of the claim in this court. For example, in 1978, in *Frunzi v. United States*, 216 Ct. Cl. 439 (1978), the Court of Claims dismissed a suit pursuant to § 1500. Two suits were filed on June 10, 1977, one in the United States District Court for the Eastern District of New York, and another in the Court of Claims. *Id.* at 439-40. The court described the same-day filings as having been filed "simultaneously," and, without discussion of the order in which they were filed that day, applied the jurisdictional bar in § 1500 to the "very same claim" filed in this court. *Id.* at 440.[11]

---

[10](...continued)
considered or decided . . . we cannot draw upon the prior caselaw for direction in this decision"). Nonetheless, *Tecon* did not explicitly overrule *British American*, *National Cored Forgings* or *Hobbs*, as these decisions applied § 1500 to "simultaneously" filed cases, and cannot be presumed to have done so *sub silentio*. *See, e.g.*, *Union Elec. Co. v. United States*, 363 F.3d 1292, 1299-1300 (Fed. Cir. 2004) (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997), for the rule that precedent should be followed unless explicitly overruled). Also, the issue of same-day filings was not before the *Tecon* court, which renders implied criticism in *Tecon*, or implied overruling, if any, of precedent on this topic mere *dictum* and non-precedential. *See Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1549 (Fed. Cir. 1994) (*en banc*) (noting that a Federal Circuit pronouncement on "the legal import of cases whose factual bases were not properly before [it] was mere *dictum*, and therefore . . . not accord[ed] . . . *stare decisis* effect").

[11]/ In 1988, the Federal Circuit issued a decision which, although silent as to the significance of its analysis of the same-day filing issue, is of interest because it refrained from applying the *Tecon* rule to a later-filed same-day filing in a district court. *See Boston Five Cents Sav. Bank, FSB v. United States*, 864 F.2d 137 (Fed. Cir. 1988) (*Boston Bank*). One issue before the Federal Circuit was "[w]hether Boston Bank's filing of the identical money damages suit in district court on the same day the Claims Court action was filed requires the Claims Court to dismiss the action under 28 U.S.C. § 1500." *Id.* at 138. The Federal Circuit duly noted that the district court suit had been filed "[l]ater [than the Claims Court suit on] the same day," but did not apply the *Tecon* rule concerning later-filed district court suits which do not trigger the jurisdictional bar in § 1500. *Id.* Instead, the court permitted the suit to proceed in this court, for a different reason, because this court had "exclusive jurisdiction over Boston Bank's monetary claim." *Id.* at 140. Thus, even where the order of filing of same-day filings was known, and the district court suit was filed later than the suit in this court, there is no indication that the Federal Circuit considered the order of filing, or the *Tecon* rule, to be helpful to the plaintiff.

In 1985, the Claims Court, bound by and citing the precedent of *Tecon*, again reviewed whether same-day filings triggered the jurisdictional bar of § 1500. *Hill v. United States*, 8 Cl. Ct. 382 (1985). In that case, the same claim was filed in both the United States District Court for the Eastern District of New York and this court, on February 7, 1985. *Id.* at 383-84. The filings were described as "simultaneous[]" by both the plaintiff and the court. *Id.* at 385 n.3. The court relied on *British American*, *National Cored Forgings*, *Hobbs* and *Tecon* to decide that the plaintiff's filing in district court was pending pursuant to § 1500. *See id.* (citing *Tecon*, 343 F.2d at 950 n.4, and "the cases cited therein"). Applying § 1500, the Claims Court dismissed the suit before it. *Id.* at 388.

The Claims Court applied the *Tecon* rule in a similar fashion in 1989. *See Nat'l Union Fire Ins. Co. v. United States*, 19 Cl. Ct. 188 (1989) (*National Union*). Plaintiffs in that case filed suits in the Claims Court and the United States District Court for the Central District of California on November 23, 1988. *Id.* at 188. Although the order of filing on that date is not apparent from the opinion, it is clear that the court considered same-day filings of the same claim to raise a bar against jurisdiction in this court. *See id.* at 189 ("There is no argument that simultaneous filing of both suits resulted in a claim 'pending' within the meaning of § 1500."). The court referenced the discussion in *Tecon* which distinguished between simultaneously filed cases, such as same-day filed cases, and later-filed cases in a district court. *See id.* (citing *Tecon*, 343 F.2d at 949-51). The Claims Court applied the jurisdictional bar and dismissed the claims before it. *Id.* at 190.

Thus, the limits of the *Tecon* rule were well-established. The *Tecon* rule, which interpreted the "pending" language in § 1500 to exclude later-filed district court cases, was not read broadly enough to require an analysis of the order of filing when same-day filings were at issue. Instead, courts relied on the language of *Tecon* which distinguished simultaneously filed cases from the general rule that later-filed cases in a district court would not defeat jurisdiction over the same claim in this court. Although none of these cases addressed the order of filing of same-day filings explicitly, the dismissal of the cases in this court filed on the same day as a district court case has been entirely consistent with *Tecon* and the interpretation of *Tecon* advanced here.

### 4. Attempted Revision of § 1500 Precedent in *UNR*

For a brief period of time, the *Tecon* rule was itself overruled by an *en banc* decision of the Federal Circuit. *See UNR*, 962 F.2d at 1023 ("*Tecon* is overruled."). The Federal Circuit reviewed the history of § 1500 and concluded that its purpose was "to force an election of forum and to prevent simultaneous dual litigation against the government." *Id.* at 1021. The *UNR* court reasoned that "Congress wanted not to dictate the order in which a claimant files suits in the Claims Court and another court on the same claim, but to discourage him from doing so altogether." *Id.* at 1022. Although the issue of later-filed suits in a district court was not before the Federal Circuit, the *UNR* court overruled the *Tecon* rule, and several other exceptions to the application of the jurisdictional bar in § 1500. Some of these revisions of precedent proved to be short-lived.

### 5. *Keene*

Although *UNR* was affirmed as to certain dispositive issues decided by the Federal Circuit, the Supreme Court declined to approve various other pronouncements in *UNR* concerning the scope of § 1500. *See Keene*, 508 U.S. at 216 ("In applying § 1500 to the facts of this case, we find it unnecessary to consider, much less repudiate, [other] 'judicially created exceptions' to § 1500 . . . ." (citations omitted)). Specifically, the Supreme Court declined to consider whether the *Tecon* rule was correctly overruled in *UNR*, noting that the facts of *UNR* did not raise the issue of later-filed suits in a district court. *Id.* at 209 n.4. The *Keene* court did cite *British American* and *Hill* approvingly, *id.* at 214 n.9, but did not discuss the "has pending" language of § 1500 in any detail. The Supreme Court in *Keene* also did not discuss same-day or simultaneous filings in relation to the jurisdictional bar in § 1500.

### 6. The *Loveladies* Affirmation of the *Tecon* Rule

After *Keene*, the Federal Circuit, in another *en banc* decision, limited the holding in *UNR* to the issues and facts before the *UNR* court. *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1549 (Fed. Cir. 1994) (*en banc*) (*Loveladies*) ("As the Supreme Court has reminded us, anything we said in *UNR* regarding the legal import of cases whose factual bases were not properly before us was mere *dictum*, and therefore we will not accord it *stare decisis* effect."). The *Tecon* rule was thus recognized to be viable precedent and is still good law in this circuit. *See Hardwick*, 72 F.3d at 886 (stating that *Tecon* "remains good law and binding on

this court”); *accord Dico, Inc. v. United States*, 48 F.3d 1199, 1201 n.4 (Fed. Cir. 1995). The scope of the *Tecon* rule was not discussed in *Loveladies*, nor was a same-day or simultaneous filings issue before the *Loveladies* court. In fact, *Loveladies* did not involve a later-filed district court suit or a later-filed appeal, either, so any commentary in *Loveladies* that could be construed as interpreting the *Tecon* rule in the first instance would be mere *dicta*. *See supra* note 10. The one comment in *Loveladies* about the “has pending” language of § 1500 is simply a historical note of the *Keene* decision, indicating that the jurisdictional test must be applied at the time of filing, not at the time the § 1500 motion is decided. *See Loveladies*, 27 F.3d at 1548 (“The question of whether another claim is “pending” for purposes of § 1500 is determined at the time at which the suit in the Court of Federal Claims is filed, not the time at which the Government moves to dismiss the action.”).

### 7. The Purpose of § 1500

After *Keene*, the Federal Circuit has continued to describe the purpose of § 1500 as preventing the filing of duplicative suits in two federal courts. In *Loveladies*, the court observed that “‘the legislative history and the cases indicate section 1500 was enacted for the benefit of the government and was intended to force an election where both forums could grant the same relief, arising from the same operative facts.’” 27 F.3d at 1550 (quoting *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1564 (Fed. Cir. 1988)). In *County of Cook*, 170 F.3d at 1090-91, the Federal Circuit discussed the policy underpinnings of the statute:

> [W]e endeavor to further the established policies of § 1500, which are “to force plaintiffs to choose between pursuing their claims in the Court of [Federal] Claims or in another court,” . . . and to “protect the United States from having to defend two lawsuits over the same matter simultaneously.”

*Id.* at 1090 (quoting *UNR*, 962 F.2d at 1018-19). The court, citing policy reasons, ruled that simultaneous filings are pending for the purposes of § 1500:

> These policies are promoted by precluding jurisdiction in the Court of Federal Claims over claims which had been

> previously filed in the district courts, and nothing suggests that these policies would not similarly be promoted by precluding jurisdiction in the simultaneous filing context. Accordingly, we hold that the "filing" of the same claim simultaneously in the district court and the Court of Federal Claims by operation of [28 U.S.C.] § 1631 [(2000)] deprives the latter court of jurisdiction pursuant to § 1500.

*Id.* at 1091. In addition to *UNR*, the Federal Circuit in *County of Cook* relied on *National Cored Forgings* for this statement of the purpose of § 1500: "'The obvious and declared purpose of [§ 1500] was to require an election between a suit in this court against the United States and one brought' in the district courts." *County of Cook*, 170 F.3d at 1090-91 (quoting *National Cored Forgings*, 132 F. Supp. at 458).

### 8. *County of Cook* and Simultaneous Filings

In the court's view, *County of Cook*, with the precedential background of *British American*, *National Cored Forgings*, *Hobbs*, *Tecon*, and *Frunzi*, resolves the question at hand: same-day filings in a district court are *per se* pending for the purposes of § 1500, and the order of filing of the two complaints on the day in question is of no consequence. *County of Cook*, it is true, can be read two different ways. If *County of Cook* is seen as directly on point and stating a rule which applies to all same-day and simultaneous filings, this rule commands that same-day filings of the same claims in two federal courts defeat jurisdiction in this court pursuant to § 1500. Or, if the facts in *County of Cook* are seen as distinguishable from same-day filings in two federal courts, *County of Cook* nonetheless states a rule regarding the purpose of § 1500, and the precedent governing the interpretation of § 1500, which commands the dismissal of a suit in this court when the same claim has been filed in district court on the same day.

*County of Cook* presented the question of whether claims in this court, deemed filed by operation of 28 U.S.C. § 1631 on the same day as the same claims filed in a district court, were barred by § 1500. The relevant text of § 1631 is reproduced here:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal *shall proceed as if it had been filed* in or noticed for the court to which it is transferred *on the date upon which it was actually filed* in or noticed for the court from which it is transferred.

28 U.S.C. § 1631 (emphasis added). Thus, if a transfer is made to this court from a district court pursuant to § 1631, the statute creates a § 1500 same-day filings scenario if the district court retains certain claims which are later shown to be the same as the claims transferred to this court. *See County of Cook*, 170 F.3d at 1090 (describing the retained claims in the district court as having been filed "simultaneously" with the claims in this court "through the operation of § 1631"). In *County of Cook*, the simultaneously filed district court claims were "pending" for the purposes of § 1500 and triggered the jurisdictional bar.

How one interprets the Federal Circuit's use of the word "simultaneous" in *County of Cook* determines the breadth of its holding. The more plausible reading of *County of Cook* is that the word "simultaneous" refers both to same-day filings in two courts, and the deemed filing date in this court of transferred claims, which, pursuant to § 1631, matches the date of the filing of the other claims retained in a suit originating in a district court. Certainly, the Federal Circuit employs simultaneous in a broad sense in *County of Cook*, in the course of two successive paragraphs. The court refers to *Tecon*, and that opinion's use of the word "simultaneously filed" to describe the claims in *British American* and *National Cored Forgings*. *County of Cook*, 170 F.3d at 1090. These cases are same-day filing cases. *County of Cook* then itself refers to *British American* and *National Cored Forgings* as involving simultaneously filed claims. *Id.* This is followed by general references to "the simultaneous filing issue," and "claims filed simultaneously," as the subject of the court's search for precedent which is "squarely on point." *Id.* If caselaw is to be "squarely on point," in *County of*

*Cook*, it must be applicable to claims transferred pursuant to § 1631. Thus, the *County of Cook* court uses the word "simultaneous" to refer to the § 1631 context, as well as other types of same-day filing scenarios, within the space of a few sentences.[12]

Next, the Federal Circuit turns to the purpose of § 1500, and the policies underlying the statute. In this regard, as mentioned *supra*, the court reasons that "[t]hese policies are promoted by precluding jurisdiction in the Court of Federal Claims over claims which had been previously filed in the district courts, and nothing suggests that these policies would not similarly be promoted by precluding jurisdiction in the simultaneous filing context." *County of Cook*, 170 F.3d at 1091. There is no indication that the word "simultaneous" in this sentence signifies only § 1631 transferred claims, and not other types of same-day filings cases. It is doubtful that the repeated, broad use of the word "simultaneous" in the preceding sentences of *County of Cook* was suddenly narrowed when the court discerned and discussed the implications of the policy objectives of § 1500.

It is true that when the Federal Circuit applied its interpretation of § 1500's purpose to the facts of *County of Cook*, the court described the force and effect of § 1500 as offering a jurisdictional bar that arises in the context of § 1631 transfers: "Accordingly, we hold that the 'filing' of the same claim simultaneously in the district court and the Court of Federal Claims by operation of § 1631 deprives the latter court of jurisdiction pursuant to § 1500." *County of Cook*, 170 F.3d at 1091. This particular, narrow statement of the functional import of § 1500 does not, however, negate the broader holding of *County of Cook*, that all types of simultaneous filings of the same claims in this court and another federal court offend § 1500. *See id.* (stating that the policies § 1500 would be furthered by "precluding jurisdiction [in this court] in the simultaneous filing context").

---

[12]/ *County of Cook* did not regard the precedent of *British American*, *National Cored Forgings* and *Tecon* as clearly dispositive of the issue before it. *See* 170 F.3d at 1090 ("Our independent review of the case law has not revealed any precedent squarely on point . . . . "). The court noted that *British American* and *National Cored Forgings* "lack an express analysis of whether a claim simultaneously filed in the district courts is 'pending' for purposes of § 1500." *Id.* The court also noted that "*Tecon's* fact situation renders the [*Tecon* rule] dictum with respect to the simultaneous filing issue." *Id.* It is the interpretation of § 1500, and the review of precedent in *County of Cook*, which together create precedent that binds the court in deciding the § 1500 issue before it.

Because *County of Cook* states a general rule regarding simultaneous filings, inclusive of both § 1631 transferred claims and same-day filings in two federal courts, same-day filings are pending, for the purposes of § 1500, regardless of their sequence of filing on the day of filing.

Plaintiff argues that only transferred claims pursuant to § 1631 are truly simultaneous, and that sequential filings in this court and a district court on the same day are not implicated by the holding in *County of Cook*. Pl.'s Resp. at 9-11. Plaintiff relies heavily on *Breneman v. United States*, 57 Fed. Cl. 571 (2003), *aff'd on other grounds*, 97 Fed. Appx. 329 (Fed. Cir. 2004).[13] The court respectfully disagrees with both plaintiff and *Breneman*.

### 9. *Breneman*

The Brenemans filed two suits on December 13, 2002, one in this court and the other in the United States District Court for the District of Massachusetts. *Breneman*, 57 Fed. Cl. at 574. In this court the plaintiffs faced a jurisdictional challenge based on § 1500, and a summary judgment challenge. *Id.* at 571, 578. In *Breneman*, the court noted that "[t]he caselaw regarding the time of filing claims here and in a district court and the subsequent jurisdictional effect of § 1500 on those claims is not clearly dispositive of the issue of same-day filing." *Id.* at 576. Although the court rejected defendant's arguments based on § 1500, the case was dismissed under the summary judgment standard. *Id.* at 586.

In its careful review of § 1500 caselaw, the *Breneman* court quoted this statement of the law:

> "[t]he sum of these cases leads us to conclude that the same action filed in district court prior to being filed in the Court of Federal Claims divests the latter of jurisdiction, as do actions filed simultaneously, but actions filed in district court subsequent to the Court of Federal Claims filing are not considered 'pending' in the

[13]/ The government did not cross-appeal this court's ruling on the § 1500 issue in *Breneman*. Brief for Appellee at *14 n.6, *Breneman v. United States*, No. 03-5156, 2004 WL 3763416 (Fed. Cir. Feb. 6, 2004).

> language of Section 1500, and thus do not divest this court of jurisdiction."

57 Fed. Cl. at 576-77 (quoting *Spodek v. United States*, 44 Fed. Cl. 32, 41 (1999)). The court agrees with this statement of the law in *Spodek*. The court does not, however, follow the *Breneman* court in four aspects of its analysis.

First, the *Breneman* court did not cite to *British American* or *National Cored Forgings*, or the fourth footnote in *Tecon*, precedent which in this court's view shows that the *Tecon* rule does not apply to same-day filings. *See County of Cook*, 170 F.3d at 1090 (noting that the statement in *Tecon* which embodies the *Tecon* rule excluding later-filed district court claims from the scope of the jurisdictional bar in § 1500 was "dictum with respect to the simultaneous filing issue"). The *Breneman* court also did not discuss *Frunzi*, *Hill* or *National Union*, all cases where, after *Tecon*, same-day filings led to the dismissal of claims in this court. In the court's view, this precedent argues strongly for ignoring the order of filing of same-day filings when deciding a § 1500 challenge.

Second, the *Breneman* court distinguished *County of Cook* and considered its holding to be limited to § 1631 scenarios where the § 1500 bar would be triggered by strictly, "truly" simultaneous scenarios. *Breneman*, 57 Fed. Cl. at 577. The court disagrees with this interpretation of precedent. Although the time of filing is considered important in § 1500 precedent, there is no indication that this phraseology refers to "the time of day of same-day filings," rather than the date the claims were filed or deemed filed. *Compare County of Cook*, 170 F.3d at 1091 n.8 ("Section 1631 mandates that the transferred claims be treated as if they were filed in the transferee court at the time they were filed in the transferor court.") *with Harbuck v. United States*, 378 F.3d 1324, 1328 (Fed. Cir. 2004) ("Thus, under § 1631, [the plaintiff's transferred] claim was deemed filed in the Court of Federal Claims on the same day on which she originally filed that claim as one of the three counts of her district court complaint."). As shown in *Harbuck*, issued after *Breneman*, the language concerning the time of filing in *County of Cook*, as it might relate to any simultaneous filing scenario, refers to the day of filing rather than any time of day. *Cf. Wilson v. United States*, 32 Fed. Cl. 794, 795-96 (1995) (noting that "[t]he date for determining jurisdiction is the date on which plaintiffs filed their complaint in the Court of Federal Claims" and dismissing a suit pursuant to § 1500 because a notice of appeal had been filed on the same day as the suit in

this court).

Third, even if the court were to accept the premise that *County of Cook*, because of its focus on § 1631, is somehow distinguishable from cases involving other types of same-day filings, the court is nonetheless bound by the statutory interpretation of § 1500 presented in *County of Cook*. *See Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005) (instructing this court to follow "the precedential and authoritative [statutory] analysis of a reviewing appellate court"). The statutory interpretation in *County of Cook* embraces two concepts: forcing plaintiffs to choose a forum for a particular claim, and protecting the United States from duplicative, simultaneous litigation. 170 F.3d at 1090-91. At the same time, *County of Cook* clearly stated that the *Tecon* rule did not apply to simultaneous filing situations. *Id.* at 1090. Given the purpose of the statute, the inapplicability of the *Tecon* rule exempting later-filed cases from the jurisdictional bar, and a long history of dismissals of suits involving same-day filings, this court is constrained to interpret *County of Cook* as stating a rule of law which applies § 1500 to same-day filings of the same claim in two courts, regardless of the order of filing on that day.[14] In the view of this court, applying the jurisdictional bar in § 1500 to same-day filings, even when the district court suit is filed later in the day than the suit filed here, is the more appropriate approach in following the rule of law stated in *County of Cook*.

Fourth, the *Breneman* court relied on *dictum* in *Richmond, Fredericksburg, & Potomac Railroad v. United States*, 75 F.3d 648, 653 (Fed. Cir. 1996) (*Richmond Railroad*), as support for its jurisdictional ruling. This *dictum*, in hypothetical terms, considered whether the *Tecon* rule could apply to same-day filings. The entire treatment of this hypothetical is reproduced here:

> Since we find that the jurisdictional flaw was subsequently cured, we need not address the question of whether, though filed on the same day, the suit in the Court of Federal Claims might have been the first filed and therefore possibly entitled to the benefit of the rule in

[14]/ Because this statement of the law is essential to the result reached in *County of Cook*, it cannot be disregarded as *dictum*. *See In re McGrew*, 120 F.3d 1236, 1238 (Fed. Cir. 1997) (defining *dicta* as "statements in judicial opinions upon a point or points not necessary to the decision of the case") (citations omitted).

*Tecon Engineers*.

*Richmond Railroad*, 75 F.3d 653 n.2 (citing generally to *Tecon* and *Hardwick*). Obviously, this statement was not necessary to the result in *Richmond Railroad* and is *dictum*. *See supra* notes 10, 14. Furthermore, *County of Cook*, decided three years later, fails to cite this *dictum* and indeed, conducted a much more thorough analysis which answered the question posed by *Richmond Railroad*: the *Tecon* rule does *not* apply to simultaneous filings. *County of Cook*, 170 F.3d at 1090. *Richmond Railroad* thus supplies no meaningful support to the jurisdictional ruling in *Breneman*.

For these reasons, the court cannot agree with the holding in *Breneman*. *Breneman* suggests that the *Tecon* rule requires an inquiry into a sequential order of filings when the same claim has been filed in a district court and this court on the same day. For the reasons outlined above, the court disagrees with this approach, and must also respectfully disagree with the *Ak-Chin I* court, 80 Fed. Cl. at 308 n.4, and the *Salt River I* court, 2008 WL 1883170, at *4-*5, which followed *Breneman* in making their jurisdictional rulings.[15] Here, the district court suit was filed on the same day as the complaint in the subject matter, and was thus *per se* "pending" for the purposes of § 1500.

### 10. Practical Considerations

In addition to the binding precedent which compels the court's resolution of the "pending" claim issue, the court notes that there are practical considerations at work here as well. This court does not time-stamp complaints. Other courts, including the United States District Court for the District of Columbia, do not time-stamp complaints, although some do. Each time a party files the same claims here and in a district court on the same day, this court will be obliged, according to

---

[15]/ Another decision of this court addressed this issue after *Breneman* was decided. In *Lan-Dale Co. v. United States*, 60 Fed. Cl. 299 (2004), the court described same-day filings to be "contemporaneous," and for lack of proof of the order of filing, or any argument thereon, considered the district court filing and the filing in this court to be simultaneous, triggering § 1500 and defeating jurisdiction in this court. *Id.* at 302 n.2 (citing *County of Cook*, 170 F.3d at 1091). To the extent that *Lan-Dale* contemplated that a court might apply the *Tecon* rule to same-day filings, the court respectfully disagrees with such an approach, for the reasons given in this opinion.

plaintiff's view of the law, to determine the order of filing in order to assure itself of its jurisdiction. At times, this issue will be hotly disputed, as it has been in this case. In such circumstances, an evidentiary hearing may be required, because the documents and affidavits submitted may not resolve the issue. This is indeed the case here. Although the operation of § 1500 throughout its history has been at times confusing and contradictory, construing § 1500 to require the taking of live testimony from paralegals and filing clerks borders on the absurd.

Duplicative suits filed on the same day in two courts should not require such an extensive inquiry. Such an inquiry frustrates all notions of judicial economy, and the purposes of § 1500. If Congress, or binding precedent interpreting § 1500, has mandated that courts conduct hearings as to the sequence of same-day filings, such an instruction has escaped discovery by this court. Nonetheless, because precedent is disputed on this issue, the court proceeds to examine the evidence of the sequence of the court filings here and in the district court. Unfortunately for plaintiff, this evidence does not help establish this court's jurisdiction over plaintiff's claims filed here.

### B. Whether Plaintiff Established That *Passamaquoddy COFC* Was Filed Before *Passamaquoddy DDC* on December 29, 2006

As previously stated, plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace*, 161 F.3d at 1377, and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748. If plaintiff is correct that the order of filing of same-day filings may permit a plaintiff to escape the bar imposed by § 1500, it is this plaintiff's burden to prove that *Passamaquoddy COFC* was filed before *Passamaquoddy DDC* on December 29, 2006. *See Alder Terrace*, 161 F.3d at 1377 (noting that "the burden of establishing jurisdiction, including jurisdictional timeliness, must be carried by the [plaintiff]") (citation omitted)). For this inquiry, the court finds it useful to review the most relevant evidence presented by the parties in roughly chronological order, beginning with those documents created at the time of, or soon after, the events in question, and ending with the testimony of Ms. Applegate, given in three evidentiary hearings. These hearings were held on October 24, 2007 for *Ak-Chin COFC*, *Ak-Chin* Tr., December 10, 2007 for *Salt River COFC*, (*Salt River* Tr.), and February 1, 2008 in the subject matter, (Tr.). Thus the evidentiary record in this case spans approximately thirteen months.

To the extent that there is conflict in this evidentiary record, the court must give more weight to contemporaneous documentary evidence. *See Cucuras v. Sec'y of Dept. of Health and Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("[T]he Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight. *United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1947). This court's predecessor adopted the same principle. *Montgomery Coca Cola Bottling Co. v. United States*, 615 F.2d 1318, 1328, 222 Ct. Cl. 356 (Ct. Cl. 1980)."); *Pikeville Coal Co. v. United States*, 37 Fed. Cl. 304, 310 (1997) (deciding an issue against plaintiff where "[t]here is no documentary evidence [to support] plaintiff's assertion . . . [and] [t]he record contains only the uncorroborated testimony of [plaintiff's] General Manager," because contemporaneous documentary evidence supported defendant's version of events) (citations omitted). When a version of events communicated by a particular witness evolves over time, a court may well consider earlier testimony or commentary to be more credible than testimony or commentary that is produced further along in the course of litigation. *See Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400, 405-06 (2004) (relying, in that case, on "recorded remarks and early correspondence [of an officer of plaintiff corporation], [as] much more credible in the Court's view than later evidence attributed to him"). Self-contradictory testimony may also reduce the credibility of a witness. *See Sternberger v. United States*, 401 F.2d 1012, 1016-17 (Ct. Cl. 1968) ("Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony." (citing *Quock Ting v. United States*, 140 U.S. 417, 420-21 (1891); *Duwamish v. United States*, 79 Ct. Cl. 530, 576 (1934))). If, after a thorough review of the evidence, no clear picture emerges as to the sequence of events on December 29, 2006, plaintiff's burden of establishing jurisdiction will not have been met. *Cf. Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 71 (2000) (awarding nothing to a plaintiff because "[n]o clear picture develop[ed] out of the testimony . . . [and] Plaintiff failed to [meet its burden of proof on a claim]").

### 1. Contemporaneous Documentation of the Events of December 29, 2006[16]

---

[16]/ Unless otherwise noted, the exhibits referenced in this opinion are joint exhibits (continued...)

During the evening of Thursday, December 28, 2006, Mr. Harper, lead counsel for plaintiff, emailed several members of the team at his firm who were involved in the filings of the tribal trust claim complaints in both courts. Ex. 1. He assigned a task to Ms. Applegate, a paralegal with the firm: "[C]an you make sure the two courts are no[]t closing early." *Id.* The next morning, at 8:59 AM, Mr. Harper emailed Ms. Applegate and told her that there still was work to be done on the *Passamaquoddy COFC* complaint and the other complaints destined for this court, and that "we will have to run those copies again while you file the DDC." Ex. 2. The parties agree that the *Passamaquoddy COFC* complaint could not have been filed before 9:26 AM, relying on an email sent to Ms. Applegate from another member of the team. Ex. 3. This email attached the final electronic versions of three COFC complaints, but noted that the *Passamaquoddy COFC* complaint was being routed through another employee, a Mr. Justin Guilder. *Id.* The only other conclusively relevant email regarding the *Passamaquoddy COFC* filing that day is an email from Ms. Applegate sent at 12:41 PM, stating that "we have filed them," referring to all of the COFC and DDC complaints for the four tribal trust claim plaintiffs. Ex. 8.

Thus, the contemporaneous documentary evidence, to which the court must give the most weight, indicates that Ms. Applegate was expected to file the DDC complaints while the COFC complaints were being finalized, and that the two Passamaquoddy complaints were filed sometime between 8:59 AM and 12:41 PM. There is no indication in contemporaneous documents, or in later statements or testimony, for that matter, that plaintiff organized its filing sequence on December 29, 2006 to avoid vulnerability to a § 1500 defense. *See* Ex. 33 at 103-04; *see also* Ex. 15 at 11. Because there is no contradictory contemporaneous documentary evidence, the presumption from this evidence is that within the relevant period of time, Ms. Applegate followed the instructions of Mr. Harper and the *Passamaquoddy DDC* complaint was filed before *Passamaquoddy COFC*.

Other pieces of contemporaneous documentary evidence are consistent with this interpretation of the sequence of events. Of all the complaints filed in the DDC by any plaintiff on December 29, 2006, it is undisputed that the

---

[16](...continued)
compiled by the parties and entered into the record during the evidentiary hearing held in the subject matter on February 1, 2008.

*Passamaquoddy DDC* complaint was the first filed. Def.'s Sur-Reply at 1 & n.1. The DDC Clerk's Office opens at 9:00 AM. Def.'s Mot. at 11. Mr. Harper's 8:59 AM email suggests that Ms. Applegate would be filing complaints at the DDC while work on the COFC complaints continued, work which cannot have been finished until 9:26 AM or later. Ms. Applegate was at work early that day, *see* Ex. B to Pl.'s Resp. App. Ex. 1 (email from Ms. Applegate sent at 7:47 AM on December 29, 2006, asking whether certain complaints were ready for processing for filing), and it would make perfect sense for her to make a first run to the DDC as soon as it opened, or soon thereafter, rather than wait for the COFC filings which were not ready.

### 2. Refreshing Ms. Applegate's Recollection

#### a. April 23, 2007

On March 27, 2007, defendant filed answers to all four tribal trust complaints filed in this court on December 29, 2006 by Mr. Harper and his team. These answers all raise a § 1500 defense. There is no evidence that before this date plaintiff's counsel made any effort to determine the order of filings of the DDC and COFC complaints on December 29, 2006.

Mr. Harper's colleague, Ms. Catherine Munson, emailed Ms. Applegate on April 23, 2007 and asked whether she "kn[e]w of a way to find out what time the [Salt River] and Passamaquoddy cases were filed in the CFC and [DDC] on Dec. 29th?" Ex. 13. Ms. Munson added that this was "important." *Id.* The subject line of the email was "Complaints in Salt River and Passamaquoddy." *Id.* Ms. Applegate's response is reproduced here in its entirety:

> No there is no precise way- there is no time stamp on documents filed during the clerk's office business hours, just the date. I had to drop them off with the intake clerk so she could process them and then come back for them. So even if I could remember what time I went over there (I'll check my emails just in case I sent one that shows when I got back) we would have no idea what time the clerk actually filed them in the DDC. As for the CFC, I know I went over and we were missing something so I

> had to come back to the office and get it, but I just don't know what time all of this happened. I'll forward you any emails in my sent box that I find in case that is helpful.

*Id.* So, approximately four months after the day in question, Ms. Applegate confesses she cannot remember when she went to the two courts, but did remember that she was "missing something" that was somehow relevant to the filing of these two complaints in the COFC, and that the "missing something" required a return trip to her office.

One minute later, Ms. Applegate supplemented her original response to Ms. Munson with an email chain of messages sent on December 29, 2006, and added this commentary:

> This isn't very precise, but from the below chain of emails to Bill it looks like I took them over to the D.DC. and picked them up between 12:41 and 2:23. I think I went to the CFC first, but I am not certain about that. Sorry that is about all that I have.

Ex. 14. Ms. Applegate here states that her memory of the sequence of filing is "not certain." *Id.* At this point, she believes she filed the *Salt River COFC* and *Passamaquoddy COFC* complaints before *Salt River DDC* and *Passamaquoddy DDC*, but she is not confident of the sequence and appears to be unable to recall any other significant details.

Beginning with these initial statements, it is interesting to track three aspects of Ms. Applegate's recollection of the events of December 29, 2006. When Ms. Applegate refers to "dropping them off" and "coming back for them" in the April 23, 2007 emails concerning the Salt River and Passamaquoddy complaints, is she referring to the *Salt River DDC* and *Passamaquoddy DDC* complaints, or something else? In addition, was Ms. Applegate indeed missing something at the COFC, and if so, did that problem require a return trip to her office that day? And finally, does Ms. Applegate become more confident over time as to the order of filing that day? Although Ms. Applegate has an explanation for every evolution in her thinking about that day's events, certain inconsistencies in her recollection are

troubling.

**b. August 13-14, 2007**

Ms. Applegate gave sworn statements in an affidavit on August 13, 2007, Ex. 19, and participated in the preparation of plaintiff's answers to defendant's interrogatories, served on August 14, 2007, Tr. at 62. At this point in time, she recalled getting an oral instruction from Mr. Harper on December 29, 2006 to file *Passamaquoddy COFC* "as early as possible, which I understood to mean before filing the Complaint initiating [*Passamaquoddy DDC*]." Ex. 19 ¶ 7; *see also* Ex. 15 at 11. Apparently Mr. Harper had concerns about filing procedures in this court and whether the court might close early for the holidays, and communicated these concerns to Ms. Applegate. Ex. 19 ¶¶ 6-7. Ms. Applegate concluded that "[t]o the best of my recollection, I followed Mr. Harper's instructions and I filed the Complaint in the instant action prior to filing the Complaint in [*Passamaquoddy DDC*]." *Id.* ¶ 8. Thus, by mid-August of 2007, Ms. Applegate could recall more details of the events of December 29, 2006, but is still not expressing absolute confidence in her memory of the sequence of filings that day.

Also by August 14, 2007, Ms. Applegate has clarified what she meant, in April, by dropping off complaints ("them") and picking "them" up later at the DDC on that day. Rather than referring to the *Salt River DDC* and *Passamaquoddy DDC* complaints, as the subject line of her first April email might indicate, the "them" of her April emails apparently only referred to one complaint. In plaintiff's answers to interrogatories, the *Ak-Chin DDC* complaint "was the last Complaint she filed that day and was the only filing that day which necessitated her returning to the District Court to complete the filing." Ex. 15 at 13; *see also id.* at 5 (statements indicating that Ms. Applegate did not drop off *Passamaquoddy DDC* and later return for any materials related to that filing).[17]

---

[17]/ The parties and the court have conducted this evidentiary inquiry by focusing largely on contemporaneous documents and the recollections of Ms. Applegate. If the parties had wished to expand the number of live witnesses, or submit additional affidavits, the time for requesting leave to do so has passed. The court accords little weight to any statements in plaintiff's responses to interrogatories, served on August 14, 2007, that report recollections of persons who did not testify before the court. *See Speck v. United States*, 28 Fed. Cl. 254, 280 (1993) (noting that answers to interrogatories are no substitute for "live testimony or

(continued...)

**c. October 24, 2007**

By the time the court held its evidentiary hearing in *Ak-Chin COFC* on October 24, 2007, further details had been refreshed in Ms. Applegate's memory. According to her testimony, another concern of Mr. Harper's on December 29, 2006 was whether the funeral of President Ford might interfere with filings at the DDC and the COFC. *Ak-Chin* Tr. at 26. She also explained that she could not recall ever having seen Mr. Harper's email directing her to first file complaints in the DDC, while changes were being made to the COFC complaints, because she was probably away from her desk. *Id.* at 30. Ms. Applegate was, in addition, able to give an exact sequence of all of the filings of that day, and was able to associate certain filings with certain short blocks of time. *See, e.g.*, *id.* at 43 (fixing the *Ak-Chin COFC* filing as occurring between 11:41 AM and 12:41 PM).

**d. December 10, 2007**

During the evidentiary hearing for *Salt River COFC* held on December 10, 2007, Ms. Applegate was again able to provide a precise chronology of her filings on December 29, 2006, activities bounded by the time-stamps of various emails that were sent and received in her office on that day. *See, e.g.*, *Salt River* Tr. at 18. Importantly, she also was able to describe what occurred at this court when she filed complaints here. Ms. Applegate testified that each time she filed a complaint here at the COFC, she received and took back to her office a receipt for the filing fee *at that time*. *Id.* at 20, 55, 62, 77. Thus, as of December 10, 2007, Ms. Applegate's version of events, as provided in testimony under oath, has her receiving and taking away a receipt for *Passamaquoddy COFC* approximately two hours before she received and took away a receipt for *Ak-Chin COFC*, which was, according to her, filed on a later trip. Nonetheless, the receipt numbers for these two receipts indicate that the *Ak-Chin COFC* receipt was filled out before the receipt was filled out for *Passamaquoddy COFC*, and indeed, ten other receipts had been issued in the interim. *Compare* Ex. 25 (receipt number 065946) *with Salt River* Tr. at 74-75 (Ms. Applegate's testimony identifying receipt number 065946

---

[17](...continued)
documentary evidence"); *see also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313 (7th Cir. 1986) (noting that answers to interrogatories cannot normally be substituted for live testimony under the Federal Rules of Evidence).

as the *Ak-Chin COFC* filing receipt) *and with* Ex. 4 (*Passamaquoddy COFC* receipt, number 065957).

Either Ms. Applegate's testimony of December 10, 2007 is inaccurate in some way, or the COFC was issuing receipts from the receipt book out of sequence. According to uncontroverted evidence provided by Ms. Lisa Reyes, Deputy Clerk for Operations of the COFC, receipts are not written and issued out of their sequential order.[18] *Salt River* Add'l Tr. at 14, 17-18, 29. The court concludes that Ms. Applegate's testimony on December 10, 2007 is in conflict with contemporaneous written evidence, and is inaccurate.

The court also notes that Ms. Applegate testified on two occasions that *Passamaquoddy COFC* was filed before *Passamaquoddy DDC*, and only subsequently did she file *Ak-Chin COFC*. The contemporaneous documentary evidence shows that *Ak-Chin COFC* was filed before *Passamaquoddy COFC*, if, as she testified, she obtained receipts upon each filing trip. Because *Passamaquoddy DDC* was the first suit filed in the DDC on December 29, 2006, and Ms. Applegate's chronology, as of December 10, 2007, crumbles into incoherence for logical inconsistencies, it appears just as likely as not that *Passamaquoddy DDC* was filed before *Passamaquoddy COFC*.

Although the receipt numbers issued by the COFC point out the most glaring inaccuracy in Ms. Applegate's testimony on December 10, 2007, several other statements from Ms. Applegate are not particularly convincing, considering the contemporaneous, or more nearly contemporaneous, documentary evidence. First, she was reportedly away from her desk and never saw an email directing her to file the DDC complaints first, sent at 8:59 AM by Mr. Harper. *Salt River* Tr. at 24-25. Oddly, according to her testimony, she was working with Mr. Harper on his floor at about that time, *id.* at 25, and every other instruction he gave her that morning about filing the complaints was oral, *id.* at 22-24, but his reportedly superseded instruction was sent by email and never received. Email reception improved at 9:26 AM, when she was sent electronic versions of various complaints, which she filed promptly in this court "[s]hortly after 9:30 AM." *Id.* at 17. Although Ms.

---

[18]/ For reasons far too complex to discuss here, receipt numbers, and docket numbers, are unreliable indicators of the order of filing of complaints at the COFC. *See Salt River* Add'l Tr. at 9.

Applegate's version of how these communications transpired is certainly possible, the court does not find her testimony, as recorded in the *Salt River COFC* transcript, to outweigh the implications of contemporary documents.

Similarly, Ms. Applegate attempted to clear up inconsistencies between her April 23, 2007 emails and her later recollection of events. When asked about the timing of the filing of the Salt River and Passamaquoddy complaints by Ms. Munson on April 23, 2007, Ms. Applegate testified that her use of the word "them" did not refer to the *Salt River DDC* and *Passamaquoddy DDC* complaints, in the context of dropping something off and returning to complete a filing at the DDC, but to the *Ak-Chin DDC* complaint. *Salt River* Tr. at 36. This is either an unusual word choice, or a strained interpretation of the email message. As for her memory, in April 2007, that she had been "missing something" when attempting filings at the COFC and had been compelled to return to her office to get something, as of December 10, 2007 Ms. Applegate testified that she had been confusing the filing trip in late December with another trip to the COFC in January for another purpose. *Id.* at 36-37. Thus, despite her earlier recollection, she now testified that nothing was missing on December 29, 2006 and she never had to go back to her office to retrieve missing items to complete any COFC filings.[19] *Id.* The court concedes that refreshed recollections may surpass in reliability previous statements made in emails to supervisors, even when such emailed inquiries are labeled important. Nonetheless, it is somewhat puzzling that the only answers provided to Ms. Munson in Ms. Applegate's first email on April 23, 2007, in essence, the two salient descriptions of events that sprang to Ms. Applegate's mind after four

---

[19]/ Although plaintiff does not argue now that a different interpretation of the "missing something" language in the April 23, 2007 email is possible, Pl.'s Sur-Reply at 19-23, in an earlier brief filed in this case, plaintiff's explanation of that "missing something" language could be construed differently. Because the *Ak-Chin COFC* complaint was, according to Ms. Applegate's recollection of events, not ready in time for the first trip to the COFC, Ms. Applegate might have been referring to the *Ak-Chin COFC* complaint when she remembered she was "missing something" on December 29, 2006. *See* Pl.'s Resp. at 14 n.7 ("While Ms. Applegate initially recalled having to make a second trip to the Court of Federal Claims that day because she was "missing something" her first trip there, the reason Ms. Applegate was required to make a second trip to the Court of Federal Claims was because the Ak-Chin Complaint was not ready when the other three Complaints were filed and it had to be delivered for filing later that same morning."). Of course, all sorts of speculation are possible as to what was "missing," if anything, on December 29, 2006, and the court notes only that no clear picture emerges as to the exact sequence of events on that day.

months had elapsed, were later explained away in Ms. Applegate's testimony as being inapt, misleading statements and muddled memories.[20]

**e. February 1, 2008**

For the third time, Ms. Applegate testified as to the events of December 29, 2006, during an evidentiary hearing in the subject matter held February 1, 2008. Prior testimony was made part of the record in this case, but for the first time the court had the opportunity to observe Ms. Applegate's demeanor, and assess her credibility. Perhaps through repetition, Ms. Applegate's delivery was rapid-fire and, for the most part, uninflected. The overall impression given was of memorized facts recited by rote. The court fully believes Ms. Applegate when she testified that her current recollection of events was refreshed by the study of various documents related to some of the events that transpired on December 29, 2006. *See* Tr. at 35-36 ("I reviewed my in-box, all the emails that I kept in my in-box, my sent items, cab receipts, District Court and CFC docket sheets. I reviewed the documents that we had gotten back from the Court that day . . . .").

What the court questions is whether her current recollection is an accurate memory, as she professes it to be, *see id.* at 36 (stating that "the memory of what I had that day is supported by everything that I have found"), or whether it is instead an explanation of how things might have happened. The court is left with the impression that Ms. Applegate's testimony is reflective both of memory and of supposition. For this reason, Ms. Applegate's testimony was not particularly persuasive. When compared against contemporaneous documentary evidence, and in light of inconsistencies and inaccuracies in her testimony, the court must conclude that Ms. Applegate's testimony was not credible as to her assertion that she filed *Passamaquoddy COFC* before *Passamaquoddy DDC*.

Ms. Applegate testified, as she had before, that she remembered the sequence of filings on December 29, 2006. Tr. at 14-15. She expressed certainty about that sequence, and asserted that, regarding the two Passamaquoddy complaints, "I filed in the CFC before I filed in the District Court that day,

---

[20]/ Of minimal relevance, but perhaps worth noting, is Ms. Applegate's testimony that December 29, 2006 "was a confusing day." *Salt River* Tr. at 69. She noted that before that day "I had in my career not filed seven complaints in one day." *Id.* at 21. In such circumstances, it is not surprising that testimony given almost one year later should contain inaccuracies.

December 29, 2006." *Id.* at 73. The court notes here relevant differences with prior testimony, some substantive, some rather minor. The court addresses the less important differences first.

Ms. Applegate now testified that she "did not have access to email for a good chunk of [December 29, 2006]." *Id.* at 18. Accordingly, she gained access to the 9:26 AM email transmitting final versions of three COFC complaints when a colleague printed it out. *Id.* at 20. She also further clarified that the term "them" in her April 23, 2007 email, referring to items dropped off at the DDC, was meant, despite the subject line of the email, to encompass the "*Ak-Chin* [*DDC*] complaint and its copies." *Id.* at 40-41. She added that "them" meant more: "Them meaning the complaint, its copies, the notice of related cases, the summons." *Id.* at 41. Ms. Applegate also no longer would use the word "confusing," to describe December 29, 2006, but preferred the adjective "busy," or "somewhat stressful." *Id.* at 50, 66.

Most importantly, Ms. Applegate no longer asserted, as she had during the *Salt River COFC* hearing, that she had received receipts when filing complaints at this court. Tr. at 14-15. She explained, in some detail, why her testimony was now changed on this topic. *Id.* at 22-25. Ms. Applegate had apparently consulted various documents after the *Salt River COFC* hearing which, in her mind, indicated that she could not have received any receipts at the COFC on December 29, 2006. *Id.* (referencing Exs. 4-6). In her view, an email sent on January 3, 2007, and the receipts themselves, indicate that no receipts had been received on December 29, 2006. *Id.* at 58.[21] Therefore, Ms. Applegate testified that she was now certain, based on contradictory contemporaneous documentary evidence, that her prior testimony was incorrect, and she recanted the testimony she gave on December 10, 2007 regarding receipts obtained at the COFC. *Id.* Ms. Applegate conceded that her prior testimony was derived not from recollection, but "from an assumption." *Id.* at 59.

Before turning to the factual issue of whether COFC receipts were received

---

[21]/ The email in question only belatedly surfaced. The court set a discovery deadline of August 14, 2007 for defendant's § 1500 motion. *See* Order of July 20, 2007. Plaintiff produced the email chain dated January 3, 2007 to defendant in January 2008, and it was admitted as Exhibit 5. Tr. at 10-11. Defendant withdrew its objection to the admissibility of this document. *Id.* at 11.

on December 29, 2006 or some later date, the court notes that Ms. Applegate's admission that she once testified based on an assumption, rather than on a recollection, supports the court's assessment that some of her testimony is supposition as to what could have happened, and not refreshed memory. The evolution of Ms. Applegate's memory of December 29, 2006, from April 23, 2007 to February 1, 2008, tends to show that much of what she now remembers is quite likely her recreation of what could have happened, rather than a recitation of vividly remembered details of what happened months before. *See* Tr. at 68 (explaining that her affidavit concerning the Ak-Chin filings was more strongly worded because "Ak-Chin was more memorable," and stating that for the Passamaquoddy complaints, her testimony is "the memory of what I had with the confirmations of the various documents that I ascertained"). In any case, the court now has before it two self-contradictory versions of testimony from Ms. Applegate. If the earlier version of her receipt collection is adopted as accurate, the inconsistency between her December 10, 2007 testimony and the COFC receipt numbers thoroughly discredits Ms. Applegate's recollection of what she did on December 29, 2006, as discussed *supra*. If her later testimony is preferred, it is clear she has no current memory concerning receipts obtained from the COFC that day, and the court must decide whether the documents she now relies upon offer support to her latest iteration of the sequence of events on December 29, 2006.

According to Ms. Reyes of the COFC, there is no way to tell, by looking at it, whether a filing receipt was mailed or picked up in person. *Salt River* Add'l Tr. at 28. There is also no way to tell whether a receipt with an attached post-it containing judge assignment information was picked up or was mailed. *See id.* at 30-31 (explaining that the judge assignment post-it is attached by a different person, "but very quickly after" the receipt is written). All of the receipts discussed in Ms. Applegate's testimony were produced with accompanying judge assignment post-its. Tr. at 56. Nothing in the documentary evidence discussed thus far precludes a conclusion that the receipts for the COFC complaints, with judge assignment post-its, were picked up by Ms. Applegate at the time she made each filing trip to the COFC. Unless supplementary evidence proves otherwise, Ms. Applegate's testimony, on December 10, 2007, that she took receipts back to her office after each trip to the COFC on December 29, 2006, is consistent with the receipts themselves.

Ms. Applegate, after December 10, 2007, reviewed the original copies of the

COFC receipts, and concluded otherwise. Tr. at 22-23. She bases her conclusion on an email exchange sent on January 3, 2007, which discusses judge assignments but does not address receipts. *See* Ex. 5; *see also* Tr. at 59 (upon cross-examination, Ms. Applegate conceded that the January 3, 2007 email chain does not discuss receipts). The relevant question posed by Mr. Harper on January 3, 2007 is "Can you check with [Ms. Applegate] if we have Judges assigned to our court of claims cases?" Ex. 5. He also mentioned that the recipient of this email, Ms. Sandy Roy, should check with Ms. Applegate to review electronic case filing (ECF) notices in his email in-box, to see if any responses to these were required. *Id.* All that can be deduced from Mr. Harper's question is that he is not aware of any judge assignments in the COFC cases, as of January 3, 2007. His email does not indicate that Ms. Applegate received, or did not receive, receipts with judge assignment post-its on them, on December 29, 2006.

Ms. Applegate's response to Mr. Harper's inquiry is informed by her consultation with Ms. Roy, who was able to access Mr. Harper's email in-box and who gleaned information from the ECF notices of judge assignments sent to him. Ex. 5. Her email message is reproduced here in its entirety:

> I don't think all of the notices have been sent yet . . . Can you forward me all of the e-notices that you got from the court and I will call in the morning. From the notices that Sandy could see on your email Ak-Chin got assigned to Hewitt, Passamaquoddy got assigned to Miller for ADR Pilot Proceeding (which I'm not sure what that means) and Bush for normal proceedings, [Tohono O'odham] was assigned to Allegra. My guess is that you have received more notices as the clerk went through all of the documents today . . . Just send them to me and we can get it figured out.

*Id.* Nothing in this email, sent at 5:21 PM, indicates that Ms. Applegate had taken the time to retrieve COFC receipts, if any had been obtained on December 29, 2006, and check them for indications of judge assignments. Rather, she appears to have given this matter brief attention and had conferred with Ms. Roy about the ECF notices and the judge assignment information available from that source. The court does not agree that this email exchange excludes the possibility that receipts

for *Passamaquoddy COFC*, *Salt River COFC*, *Tohono O'odham COFC* and *Ak-Chin COFC* had been obtained on December 29, 2006, as Ms. Applegate had once testified. The email exchange does not compel the conclusion reached by Ms. Applegate, that "none of us had known about the Judge assignments before [January 3, 2007]." Tr. at 60. The January 3, 2007 email also does not exclude the possibility that, even if Ms. Applegate was not aware of judge assignments until January 3-4, 2007, she might have received receipts with post-its containing that information on December 29, 2006, and simply might not have paid attention to that information as she was getting ready to leave for her vacation. *See Ak-Chin* Tr. at 22 (noting that Ms. Applegate "had a vacation planned, so [she] was determined to get [the December 29, 2006 filings] finished before the close of business"). The court concludes that Ms. Applegate is overly reliant on this email for a new, and quite possibly faulty, assumption about what might have happened on December 29, 2006.

Because the January 3, 2007 email is not conclusive on this issue, the court cannot determine whether Ms. Applegate received COFC receipts on December 29, 2006, or on some later date. If she did receive those receipts, her recollected chronology falls apart as irreconcilable with contemporaneous documentary evidence. If she did not receive the COFC receipts on that day, the court is forced to choose between believing Ms. Applegate's testimony, with its labored reconstruction of the day's events built partly on assumptions, or giving more weight to the contemporary documentary evidence, which points largely to the conclusion that *Passamaquoddy DDC* was filed before *Passamaquoddy COFC*. Ultimately, because, as stated *supra*, the court did not find Ms. Applegate's testimony to be either persuasive or credible, the court finds that plaintiff has not met its burden of establishing that *Passamaquoddy COFC* was filed before *Passamaquoddy DDC*. The court finds, by the preponderance of the evidence, that *Passamaquoddy DDC* was most likely filed before *Passamaquoddy COFC*, and by any interpretation of the term, was pending for the purposes of § 1500 when *Passamaquoddy COFC* was filed.

## III. Analysis of the Overlapping Claims Issue

The *Passamaquoddy DDC* suit was pending when *Passamaquoddy COFC* was filed. The court now turns to the other inquiry necessitated by a § 1500 challenge: whether a claim filed in the district court overlaps, to a degree

sufficient to trigger the jurisdictional bar of § 1500, with a claim brought in this court. Fortunately, the precedent on this issue is much less convoluted than precedent concerning same-day filings and the "pending" claim issue.

The relevant precedent concerning overlapping claims was discussed at length in both *Tohono O'odham I* and *Ak-Chin I*. *See Tohono O'odham I*, 79 Fed. Cl. at 654-56; *see also Ak-Chin I*, 80 Fed. Cl. at 313-16, 321 n.9. The comparative analysis of claims before the district court and the claims before this court conducted in the *Tohono O'odham I* and *Ak-Chin I* opinions was almost the same. This is not surprising, because plaintiff's counsel employed the same template for the *Tohono O'odham DDC* and *Ak-Chin DDC* complaints, and the same template for the *Tohono O'odham COFC* and *Ak-Chin COFC* complaints. The same templates were again used, respectively, for the *Passamaquoddy DDC* and the *Passamaquoddy COFC* complaints.

For example, except for differences related to a tribe's name or a tribe's trust assets, the assertions in paragraphs 1-4, 6-15, and 17-44 of the complaints in *Tohono O'odham DDC*, *Ak-Chin DDC*, and *Passamaquoddy DDC*, and the text of each of the nine paragraphs praying for relief therein, are virtually identical. Similarly, except for differences related to a tribe's name or a tribe's trust assets, many of the paragraphs of the complaints in *Tohono O'odham COFC*, *Ak-Chin COFC*, and *Passamaquoddy COFC* contain only slight variations in language and make similar allegations as to the United States' trust responsibilities. The prayers for relief in *Tohono O'odham COFC*, *Ak-Chin COFC*, and *Passamaquoddy COFC* are identical, except for the varying references to the name of the tribal plaintiff, and, in the case of *Passamaquoddy COFC*, the omission of a request for interest on damages. *See* Compl. at 13.

In both *Tohono O'odham I* and *Ak-Chin I*, the court found significant overlap in the claims presented to the district court and this court. *See Tohono O'odham I*, 79 Fed. Cl. at 659 ("There is plainly substantial overlap in the operative facts as well as in the relief requested. That being the case, unfortunately for plaintiff, section 1500 is a bar."); *see also Ak-Chin I*, 80 Fed. Cl. at 322 (finding that "plaintiff's complaints are based on the same operative facts and seek overlapping relief that is not distinctly different"). In light of the substantial parallelism between the complaints filed in *Tohono O'odham DDC*, *Ak-Chin DDC*, and *Passamaquoddy DDC*, and in *Tohono O'odham COFC*, *Ak-Chin COFC*, and

*Passamaquoddy COFC*, it is not surprising that here, too, substantial overlap exists between the claims presented in the *Passamaquoddy DDC* and *Passamaquoddy COFC* complaints. The court will endeavor to succinctly summarize the relevant precedent, and apply this precedent to the § 1500 challenge before it.[22]

### A. Controlling Precedent

The parties agree that the comparison of claims in the district court and this court focuses both on the operative facts supporting each claim, and the relief requested from each court. *See* Def.'s Mot. at 7 (citing *Loveladies*, 27 F.3d at 1551-52); Pl.'s Resp. at 15 (citing *Loveladies*, 27 F.3d at 1551). The parties also agree that the comparisons of operative facts and of requested relief constitute two separate prongs of the analysis and that each must be satisfied, as well as the "pending" suit prong, for § 1500 to bar a suit in this court. Def.'s Mot. at 7; Pl.'s Resp. at 1, 3, 15. The parties disagree, however, as to the degree of overlap in claims which is required to trigger the jurisdictional bar in § 1500.

Defendant argues that the operative facts in the two claims "need not be identical," Def.'s Mot. at 7 (citing *Johns-Manville*, 855 F.2d at 1562-63), and that "[i]t is sufficient that they are substantially the same," *id.* (citing *Keene*, 508 U.S. at 212-14). Plaintiff contends, interestingly, that the "substantially the same operative facts" language in *Keene*, as employed by defendant, is an attempted "dilut[ion]" of the *Loveladies* standard.[23] Pl.'s Resp. at 15 n.8. Plaintiff also

---

[22]/ Because the *Tohono O'odham I* and *Ak-Chin I* opinions provide an enlightening review of the historical development of the test for determining whether claims in two federal courts overlap, the court truncates its discussion of this topic. *See Tohono O'odham I*, 79 Fed. Cl. at 654-56; *see also Ak-Chin I*, 80 Fed. Cl. at 313-16, 321 n.9. In addition, to the extent that certain of plaintiff's many arguments are not specifically addressed in this opinion, the court relies on the analyses of those same arguments in *Tohono O'odham I* and *Ak-Chin I* as grounds for again rejecting them. For example, the court again concludes that the distinctions drawn between specific monetary relief and money damages in *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988), are inapposite to the § 1500 analysis, for the reasons stated in *Tohono O'odham I*, 79 Fed. Cl. at 658 & n.14.

[23]/ None of the cases cited by plaintiff as support for this proposition asserts that *Loveladies* is anything but an elucidation of the principles outlined in *Keene*. *See Fire-Trol Holdings, LLC v. United States*, 65 Fed. Cl. 32, 34 (2005) (referring to *Loveladies* as "the

(continued...)

asserts that while claims sometimes share background facts, unless these claims also rely on the same facts as material, operative facts, similar background facts do "not implicate § 1500's bar." Pl.'s Resp. at 17 (citing numerous nonprecedential decisions).

The parties also disagree on the amount of overlap that must be present in the prayers for relief for two suits to run afoul of § 1500. Defendant states that identical requested relief is not required, because "[i]t is enough that there is some overlap in the relief requested." Def.'s Mot. at 7 (citing *Harbuck*, 378 F.3d at 1329). Plaintiff, on the other hand, suggests that to suffer from the requisite amount of overlap, the two suits must both contain at least one request for relief that is identical. *See* Pl.'s Resp. at 28 ("[T]he rule against overlapping relief applies where exactly the same relief is requested in both courts, and that remains true even though other and different relief is also requested.") (citing *Harbuck*, 378 F.3d at 1329)).

### 1. *Loveladies* on "Same Operative Facts"

Both parties rely on the Federal Circuit's analysis of these issues in *Loveladies*. As for the operative facts prong, *Loveladies* followed *British*

---

[23](...continued)
Federal Circuit's explication of *Keene* which developed it into a two prong test"); *Manke Lumber Co. v. United States*, 44 Fed. Cl. 219, 222 (1999) (noting that the *Loveladies* opinion neither defined operative facts, nor "explored the definition of 'same operative facts'"). Plaintiff's contention, that *Keene* and *Loveladies* offer differing guidance as to the test for the "same" or "substantially the same" operative facts in two suits, is unsupported by authority and is illogical. *See* Pl.'s Resp. at 15 n.8 (describing each opinion as producing a distinct standard). The truncated restatement in *Loveladies* concerning a required condition for the operation of § 1500, a condition which was discussed in detail in *Keene*, does not indicate that the Federal Circuit was attempting to overrule Supreme Court precedent. *See Ak-Chin I*, 80 Fed. Cl. at 315-16 (reconciling statements of the law in *Keene* and *Loveladies* by incorporating the phrasing and principles announced in each decision); *Tohono O'odham I*, 79 Fed. Cl. at 656 (reconciling *Keene* and *Loveladies* in a similar fashion, because "[t]hat reading of *Loveladies* is, in any event, compelled by the controlling language of *Keene*"); *cf. Koerner v. Grigas*, 328 F.3d 1039, 1050-52 (9th Cir. 2003) (reconciling an *en banc* decision of the Ninth Circuit with prior Supreme Court precedent). In any case, even if plaintiff's implausible and strained reading of *Loveladies* could be viewed as controlling precedent, the operative facts in the two complaints at issue in this controversy are the same, and substantially the same, satisfying even plaintiff's proposed version of the applicable standard.

*American* and summarized the analytical construct used by the Court of Claims in that case:

> The Court of Claims held that § 1500 barred the claim before it. It made no difference that the two suits were based on different legal theories; the plaintiff had only one claim for money based on the same set of facts.

*Loveladies*, 27 F.3d at 1551. The Federal Circuit in *Loveladies* cited *Johns-Manville* as a decision that is "consistent" with *British American*. *Loveladies*, 27 F.3d at 1551. In that case, the operative facts were the "same," even though the various plaintiffs in that case were exposed to asbestos at different times and in different ways. *See Johns-Manville*, 855 F.2d at 1563-64. In *Keene*, the operative facts question was described as "whether the plaintiff's other suit was based on substantially the same operative facts," and the Court noted that "Congress did not intend [§ 1500] to be rendered useless by a narrow concept of identity providing a correspondingly liberal opportunity to maintain two suits arising from the same factual foundation." 508 U.S. at 212-13. From these precedents, *Loveladies* summarized the operative facts prong as "[f]or the Court of Federal Claims to be precluded from hearing a claim under § 1500, the claim pending in another court must arise from *the same operative facts*." 27 F.3d at 1551.

*Loveladies* should not be read to limit the application of § 1500 to suits where the operative facts are absolutely identical in all respects. *See Tohono O'odham I*, 79 Fed. Cl. at 656 (noting that *Loveladies* has more to offer on this issue than just the "same relief" language, and stating that "the inquiry is whether there is meaningful overlap . . . in the underlying facts . . . in the two actions"). The court does not read *Loveladies* to require more than the Supreme Court in *Keene*, for two reasons. First, *Johns-Manville* discussed the "same" operative facts issue and concluded that precedent compelled dismissal of a claim in this court even where only some of the operative facts were the same as those supporting a claim pending before another federal court. *See* 855 F.2d at 1562, 1564 (discussing *Los Angeles Shipbuilding & Drydock Corp. v. United States*, 152 F. Supp. 236 (Ct. Cl. 1957)). *Loveladies* explicitly did not reach this issue, and thus the holding in *Johns-Manville* regarding overlapping, but not identical, operative facts is good law and binding precedent on this court. *See Loveladies*, 27 F.3d at 1552 n.19 (noting that the parties had been asked to brief, but the court did not

decide, this question: "'If some but not all of the operative facts are the same, does *Johns-Manville* require that the § 1500 bar apply?'").

Second, the *Loveladies* court did not apply the concept of "same operative facts" to the facts before it in that case, and thus *Loveladies* is of little precedential assistance, if any, in defining those terms beyond the meaning given them in *Keene* and *Johns-Manville*. *See Loveladies*, 27 F.3d at 1551 n.17 ("Because it is unnecessary for our decision in this case, we need not further refine the meaning of 'operative facts.'"); *id.* at 1552 (analyzing the § 1500 challenge before the court while "accept[ing], as we have done *arguendo*, that Loveladies' two suits arise from the same operative facts"). The court concludes that the descriptive term, "the same operative facts," used in *Loveladies*, encompasses the less narrow descriptive term, "substantially the same operative facts," that was given in *Keene*. *See supra* note 23. Thus, if plaintiff in *Passamaquoddy DDC* and *Passamaquoddy COFC* relies on the same, or substantially the same, operative facts in support of the two suits, the "same operative facts" prong of the § 1500 analysis is satisfied.

### 2. *Loveladies* on "Same Relief"

The Federal Circuit in *Loveladies* fully addressed and demonstrated, in great detail, how to conduct the inquiry into possible overlap in the relief requested in two suits, and *Loveladies* governs this court's decision as to whether the overlap in the requested relief in the *Passamaquoddy DDC* and *Passamaquoddy COFC* complaints triggers the jurisdictional bar in § 1500. *See* 27 F.3d at 1549-56. There is language in *Loveladies* which, in isolation, supports plaintiff's view that there must be at least one identical request for relief in each suit for § 1500 to apply. *See* 27 F.3d at 1551 (stating that the two suits "must seek the same relief"); *id.* at 1552 (describing the applicable principle, in this inquiry, as the "identity of relief requested"). But *Loveladies* follows *Keene* and cannot be read to modify the phrase in *Keene* which requires only that there be "some overlap in the relief requested" for § 1500 to pose a bar to jurisdiction. *Keene*, 508 U.S. at 212; *see Ak-Chin I*, 80 Fed. Cl. at 316 (reconciling *Loveladies* and *Keene* by incorporating the "some overlap" language of *Keene*, instead of requiring perfectly identical demands for relief); *Tohono O'odham I*, 79 Fed. Cl. at 656 (reconciling *Loveladies* with *Keene* and noting that "[a] perfect symmetry of demands for relief is not necessary").

Although the exact bounds of troublesome overlap are not demarcated in *Loveladies*, it is clear that two complaints which seek "distinctly different" relief are immune from a § 1500 challenge. *See* 27 F.3d at 1554 (concluding, in that appeal, that § 1500 would not apply because "the claims in the two courts are for distinctly different and not the same or even overlapping relief"). It is also clear that the court must analyze not only the phrasing of the two sets of prayers for relief, but also their pragmatic purpose, to determine what relief is sought from each court. *See id*. at 1553-54 (examining the relief the two federal trial courts could provide, and "reading the two complaints in light of the legal and factual circumstance in which they were drawn"). Thus, when examining two complaints, *Loveladies* instructs that § 1500 may apply when the requests for relief are not distinctly different in their nature, and there is some overlap in the requests for relief. *Accord Ak-Chin I*, 80 Fed. Cl. at 316; *Tohono O'odham I*, 79 Fed. Cl. at 656.

### 3. *Harbuck* on "Same Relief"

In 2004, the Federal Circuit provided further guidance in its *Harbuck* decision. All of the analytical terms required for comparing the requested relief in two complaints are reproduced therein, including "'distinctly different,'" *Harbuck*, 378 F.3d at 1329 (quoting *Loveladies*, 27 F.3d at 1549), "'some overlap,'" *id.* (quoting, in a parenthetical, *Keene*, 508 U.S. at 212), and "'same relief,'" *id.* at 1328 (quoting *Loveladies*, 27 F.3d at 1551). Complaints containing overlapping requests for relief triggered § 1500 in the appeal before the *Harbuck* court: "The inclusion of other and different requested relief in the two complaints does not avoid the application of [§ 1500]." *Id.* at 1329 (citing *Keene*, 508 U.S. at 212). Although no clear line is drawn in *Harbuck* as to how much overlap is required to meet the "same relief" test, the holding in *Harbuck* shows, as an example, that seeking back wages for the same period of time from two courts is adequate overlap to preclude jurisdiction in this court. *Id.* By analogy, if the plaintiff in this case is seeking money from the United States in both *Passamaquoddy DDC* and *Passamaquoddy COFC*, for breaches of trust regarding the same trust corpus for the same period of time, even if other, additional relief is requested in either suit, the "same relief" prong of the § 1500 analysis is satisfied.

## B. Operative Facts in the *Passamaquoddy DDC* and *Passamaquoddy COFC* complaints

Plaintiff's suit in this court alleges "gross breaches of trust by the United States" and asserts that "continuing material breaches of statutory, regulatory and fiduciary duties" constitute the foundation for plaintiff's claims in the subject matter. Compl. ¶ 1. Similarly, in plaintiff's complaint filed in *Passamaquoddy DDC*, plaintiff seeks "redress of breaches of trust by the United States." DDC Compl. ¶ 1. Although the complaint in the district court emphasizes defendant's responsibility to provide plaintiff with an accounting, as well as defendant's duty to restore plaintiff's accounts to their proper balances, all of the facts necessary to a determination of the breaches of trust alleged by plaintiff in the subject matter are also needed for the District Court's inquiry. Indeed, a review of the key allegations of fact related to breaches of trust in both suits reveals that each suit will examine the same evidence.

For example, a comparison of paragraph 24 of plaintiff's complaint in this action and paragraph 20 of plaintiff's complaint in the district court shows that plaintiff's theories of entitlement to relief in both courts depend on largely identical factual allegations. Referenced in both suits are the government's failure to render clear (or complete) accounts, to skillfully administer trust property for productive use, to preserve the tribe's assets, to deposit trust funds properly, and to refrain from self-dealing. *Compare* Compl. ¶ 24 *with* DDC Compl. ¶ 20. In addition, the same trust corpus and the same time period are the subject of the claims in *Passamaquoddy DDC* and *Passamaquoddy COFC*. *Compare* DDC Compl. ¶¶ 12-19 *with* Compl. ¶¶ 14-23. It is clear that plaintiff's suits ask two courts to consider the same operative facts necessary to the determination of whether the United States has fulfilled its trust responsibilities to the tribe. The "same operative facts" prong of the § 1500 analysis is thus satisfied.

Plaintiff's arguments to the contrary have been rejected in the *Ak-Chin I* and *Tohono O'odham I* decisions, and must be rejected again here. *See Ak-Chin I*, 80 Fed. Cl. at 316-20 (rejecting plaintiff's two arguments contending that the two complaints relied upon different operative facts); *Tohono O'odham I*, 79 Fed. Cl. at 656 (summarily rejecting plaintiff's arguments that the two suits depended on different operative facts and holding, after a thorough review of both complaints, that "there can be no meaningful dispute . . . [because] [t]he underlying facts are the same"). The court has considered plaintiff's first argument, that any similarities between the facts cited in each complaint are mere background facts,

not operative facts, and the cases plaintiff cites in support of this argument, and finds it to be without merit. *Accord Ak-Chin I*, 80 Fed. Cl. at 318-19. The operative facts necessary to an equitable accounting action in the district court are also necessary in a suit for the determination of damages owed because of a breach of trust, cognizable in this court. *See Tohono O'odham I*, 79 Fed. Cl. at 657 ("In substance, the action for breach of trust in this court is an equitable proceeding that produces a monetary remedy."). The United States will be held accountable for the same breaches of trust in either suit, and the proof of those breaches of trust will be, in all important respects, the same. For this reason, the operative facts underlying each suit are the same.

Plaintiff's second argument is that each suit seeks to prove breaches of different trust duties, and for this reason, different operative facts are at issue in each suit. *See* Pl.'s Resp. at 20 (stating that "the trust duties in the two cases are different – the accounting obligation and other duties at issue in the District Court are not the same trust duties as the money-mandating duties that support Plaintiff-Beneficiary's three-count complaint here in the Court of Federal Claims"). The court disagrees. Plaintiff's two complaints are a textbook example of pursuing the same monetary goal by utilizing two legal theories. As the Court of Claims held in *British American*, a court must focus not on the legal theories underlying the claim in each court, but on the "sameness" of the claim:

> A recital of the operative facts relied upon by a claimant does not state two separate and distinct causes of action merely because such facts may set up a liability both in tort and contract. The terms "conversion" used in the suit in the District Court and "taking of property without just compensation" in the suit in this court were obviously used by plaintiff for the purpose of attempting to adapt the single claim to the jurisdiction of the different courts in which the claim was being urged, but the use of these terms does not obscure the unity or sameness of the claim. We think it is clear that the word "claim," as used in [the predecessor of § 1500], has no reference to the legal theory upon which a claimant seeks to enforce his demand . . . .

89 Ct. Cl. at 440. Here, it is of no consequence that plaintiff styles its suits to focus on different trust duties, when the proof of breach of each of those purportedly distinct duties will necessarily require review of the same facts. *See Tohono O'odham I*, 79 Fed. Cl. at 658 ("Although plaintiff refers to the money requested here as 'damages,' the action here is for a breach of trust, and the means for proving breach and financial injury would be the same as in the district court."). Thus, the same operative facts govern both *Passamaquoddy DDC* and *Passamaquoddy COFC*.

### C. Relief Requested in the *Passamaquoddy DDC* and *Passamaquoddy COFC* Complaints

Because the § 1500 "same relief" prong only requires some overlap in the relief requested in two courts, the court limits its discussion to the money that plaintiff seeks to obtain through either suit. As the *Tohono O'odham I* court explained, "[h]owever characterized, the calculus involved in determining how much money the plaintiff is owed would be the same in both courts." 79 Fed. Cl. at 658. In *Passamaquoddy DDC* and *Passamaquoddy COFC*, too, plaintiff seeks the same monetary relief for breaches of trust by the United States in each suit, and § 1500 provides a bar to the suit in this court.

All of plaintiff's arguments to the contrary were thoroughly refuted in *Tohono O'odham I* and *Ak-Chin I*, and the court declines to expand upon those excellent discussions of the law. *See Ak-Chin I*, 80 Fed. Cl. at 321 (concluding that "both complaints seek monetary relief," demand overlapping relief which is not distinctly different, and thus trigger § 1500's bar on jurisdiction in this court); *Tohono O'odham I*, 79 Fed. Cl. at 659 ("Both actions, in sum, seek a restatement of accounts, restitution, and disgorgement . . . ."). The court has reviewed the requests for relief in *Passamaquoddy DDC* and *Passamaquoddy COFC* and finds that identical monetary relief is sought in each suit.

In the district court, plaintiff requests "a complete, accurate, and adequate accounting of all trust assets belonging to the tribe and held in trust by" the United States. DDC Compl. at 17. Plaintiff also seeks declaratory relief suggesting that breaches of fiduciary duties have occurred, and urges the district court to compel defendant to fulfill its fiduciary duties. *Id.* Further, plaintiff requests a restatement of the tribe's trust fund account balances to reflect the accounting ordered by the

district court, and additional equitable relief to obtain other monies owed to the tribe by the United States or third parties. *Id.* at 18. In the court's view, these mechanisms are sufficient to redress any and all financial losses the tribe has incurred due to breaches of trust by the government, and these mechanisms describe the contours of plaintiff's overall request for monetary relief based on breaches of trust by the United States.

In this court, plaintiff seeks a ruling on liability and the quantum of damages owed to the Passamaquoddy Tribe "for the injuries and losses caused as a result of Defendant's breaches of fiduciary duty." Compl. at 13. This is the same money, for the same period of time, for the same breaches of fiduciary duty by the United States, as was requested in the suit in the district court. The court finds that the *Passamaquoddy DDC* and *Passamaquoddy COFC* complaints seek overlapping relief which is not distinctly different, and that the "same relief" prong of the § 1500 analysis is also satisfied.

## CONCLUSION

The court holds that because *Passamaquoddy DDC* was filed on the same day as *Passamaquoddy COFC*, *Passamaquoddy DDC* was pending when *Passamaquoddy COFC* was filed, as a matter of law under controlling precedent interpreting 28 U.S.C. § 1500. Claimants who wish to pursue parallel litigation in this court and a federal district court would be wise to forbear from filing their complaints on the same day, to avoid the pitfalls of § 1500. To fully benefit from this court's unique ability to award substantial money damages in suits against the United States, a party should consider filing first in the United States Court of Federal Claims. *See Suburban Mortgage Assocs., Inc. v. U.S. Dept. of Housing and Urban Dev.*, 480 F.3d 1116, 1118, 1121 (Fed. Cir. 2007) (noting that suits seeking more than $10,000 from the United States belong in this court).

On the other hand, if the court has misread precedent and the order of filing of same-day filed complaints is pertinent to a jurisdictional challenge based on § 1500, plaintiff has not established that *Passamaquoddy COFC* was filed before *Passamaquoddy DDC*. The court finds, based on the preponderance of the credible evidence before it, that *Passamaquoddy DDC* was already filed and pending when *Passamaquoddy COFC* was filed. The court also finds that *Passamaquoddy COFC* and *Passamaquoddy DDC* are suits arising from the same operative facts

and seeking the same relief. *See Loveladies*, 27 F.3d at 1551.

For the foregoing reasons, plaintiff's complaint must be dismissed for lack of jurisdiction, because of the limit on this court's jurisdiction imposed by § 1500. Accordingly, it is **ORDERED** that:

(1) Plaintiff's Motion for Leave to File Notice of Supplemental Authority, filed April 29, 2008, is **DENIED** as moot;

(2) Defendant's Motion to Dismiss Pursuant to 28 U.S.C. § 1500, filed September 28, 2007, is **GRANTED**;

(3) The Clerk shall **ENTER** final judgment for defendant, **DISMISSING** the complaint, without prejudice; and

(4) Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
JUDGE